SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| STATE OF ARIZONA, | ) Arizona Supreme Court |
| | ) No. CR-08-0098-AP |
| Appellee, | ) |
| | ) Maricopa County |
| v. | ) Superior Court |
| | ) No. CR2004-005523-001 |
| JOSHUA IDLEFONSO VILLALOBOS, | ) |
| | ) |
| Appellant. | ) |
| | ) **O P I N I O N** |
| _____ | ) |

Appeal from the Superior Court in Maricopa County
The Honorable Raymond P. Lee, Judge

**AFFIRMED**
_____

TERRY GODDARD, ARIZONA ATTORNEY GENERAL                    Phoenix
     By   Kent E. Cattani, Chief Counsel,
          Criminal Appeals/Capital Litigation Section
          Jonathan Bass, Assistant Attorney General       Tucson
Attorneys for State of Arizona

DROBAN & COMPANY, PC                                       Anthem
     By   Kerrie M. Droban
Attorney for Joshua Idlefonso Villalobos
_____

**H U R W I T Z**, Vice Chief Justice

¶1      Joshua Idlefonso Villalobos was convicted of first degree murder and child abuse and sentenced to death for the murder.  We have jurisdiction over this automatic appeal pursuant to Article 6, Section 5(3) of the Arizona Constitution and A.R.S. §§ 13-4031 and 13-4033(A)(1) (2010).

## I. FACTS AND PROCEDURAL HISTORY[1]

¶2        Villalobos lived with Annette Verdugo, five-year-old Ashley Molina (Verdugo's daughter), and the couple's two-year-old daughter. On January 3, 2004, Villalobos and the children picked Verdugo up at work and took her to dinner. Ashley did not eat and complained about stomach pains. Villalobos and the children again picked Verdugo up from work after her shift ended in the early morning of January 4. When Verdugo noted an odd smell, Villalobos claimed he had vomited in the car.

¶3        When they arrived home, Villalobos carried Ashley upstairs and put her to bed. At approximately 7 a.m., Villalobos told Verdugo that Ashley was unresponsive. Ashley's body was cold and hard. Villalobos told Verdugo "they're going to think it's me, I was the only one with her."

¶4        After some delay, Villalobos and Verdugo took Ashley to the hospital. The emergency room physician recognized immediately that Ashley was dead; she found "somewhere between 150 to 200 bruises" on Ashley's body. After Villalobos told the physician that the bruises were from a fall in the shower, Phoenix police were summoned.

---

[1]     The facts are viewed in the light most favorable to sustaining the guilty verdicts. *State v. Garza*, 216 Ariz. 56, 61 n.1, 163 P.3d 1006, 1011 n.1 (2007).

¶5      Villalobos was taken to the police station and given *Miranda* warnings.  Villalobos denied hitting Ashley, and a detective asked him to take a polygraph examination.  Villalobos agreed.  During the examination, Villalobos initially denied injuring Ashley.  When the polygrapher accused him of lying, Villalobos admitted that he had punched Ashley.

¶6      After the polygraph, a second detective resumed the interrogation.  Villalobos admitted that, before Verdugo's dinner break, he had grabbed Ashley by the arm and hit her several times with a closed fist.  Villalobos also said that Ashley had passed out in the car and then vomited on him while he was picking Verdugo up from work.

¶7      The medical examiner who conducted the autopsy later concluded that Ashley had died of blunt force trauma to the abdomen.  He opined that Ashley could have survived for no more than four hours after the fatal injuries and had died between five and eight hours before being taken to the hospital.  The autopsy also revealed other internal injuries that predated the fatal injuries.

¶8      A grand jury indicted Villalobos for child abuse and first degree murder.  Verdugo was indicted for second degree murder and child abuse.  She later pleaded guilty to attempted child abuse and testified at Villalobos's trial.

3

¶9        A superior court jury found Villalobos guilty on both counts.  During the aggravation phase of the trial, the jury found three aggravating circumstances:  the offense was committed in an especially heinous, cruel, or depraved manner, A.R.S. § 13-751(F)(6) (2010);[2] Villalobos committed the offense while on release from the state department of corrections, A.R.S. § 13-751(F)(7)(a); and the victim was a child under the age of fifteen, A.R.S. § 13-751(F)(9).  After the penalty phase, the jury concluded that any mitigating circumstances were not sufficiently substantial to call for leniency and death was the appropriate sentence.

## II. ISSUES ON APPEAL

### A. GUILT PHASE

#### 1. Motion to Suppress Statements Made to Police and the Polygrapher

¶10        Villalobos argues that the trial court erred in refusing to suppress his statements to the detectives and the polygrapher.  We review a trial court's denial of a motion to suppress a confession for "clear and manifest error," the equivalent of abuse of discretion.  *State v. Newell*, 212 Ariz. 389, 396 ¶ 22 & n.6, 132 P.3d 833, 840 & n.6 (2006).

---

[2]    We cite the current version of statutes in the absence of any relevant material changes since the date of the offenses.

### a. *Miranda* Warnings

¶11    After receiving *Miranda* warnings, Villalobos acknowledged that he understood his rights and answered all questions posed to him.  The trial court therefore did not abuse its discretion in concluding that the State proved that Villalobos knowingly and intelligently waived his *Miranda* rights.  *See State v. Tapia*, 159 Ariz. 284, 286-87, 767 P.2d 5, 7-8 (1988).

¶12    Villalobos argues, however, that *Miranda* warnings should have been reissued before his subsequent encounters with the polygrapher and the second detective.  Repeated *Miranda* warnings are required in "circumstances suggesting that a suspect is not fully aware of his rights."  *State v. Trostle*, 191 Ariz. 4, 14, 951 P.2d 869, 879 (1997).  But this is not such a case.  Villalobos not only received the required warnings before the initial interrogation, but also reviewed and signed a consent form reiterating his *Miranda* rights just before the polygraph examination began.  Only three hours elapsed between the beginning of the interview and its conclusion, and Villalobos was aware at all times that he was speaking with police department employees.  *See id.* (holding repeated warnings unnecessary for an interrogation that lasted over seven hours at three separate locations); *State v. Gilreath*, 107 Ariz. 318,

5

319, 487 P.2d 385, 386 (1971) (same regarding one twelve-hour gap and one thirty-six-hour gap between warnings).

### b. Voluntariness

¶13     Villalobos also argues that his statements were involuntary.  The State must prove that a confession was "freely and voluntarily made and was not the product of coercion." *State v. Boggs*, 218 Ariz. 325, 335 ¶ 44, 185 P.3d 111, 121 (2008).  The superior court did not abuse its discretion in concluding that the State met that burden here.  The interviewing detectives and polygrapher each testified that they did not threaten, coerce, or make any promises, and the record supports that testimony.

¶14     Villalobos contends the polygrapher coerced him into making inculpatory statements by telling him that an autopsy and DNA evidence could prove his guilt.  These predictions, however, were accurate and, even if false, would not have rendered the confession involuntary.  *See, e.g., Trostle*, 191 Ariz. at 15, 951 P.2d at 880 (holding that a deliberate falsehood by interrogators did not render a confession involuntary).  The polygrapher's request that Villalobos tell the truth to "get out of this hole" was also permissible.  *See, e.g., State v. Amaya-Ruiz*, 166 Ariz. 152, 165, 800 P.2d 1260, 1273 (1990) (noting that police requests for a suspect to tell the truth without threat or promise are not inherently coercive).

6

¶15     When talking to the second detective, Villalobos worried that he would be imprisoned for life for killing Ashley. The detective responded:  "Not necessarily, not necessarily, there's going to come a day when you have a relationship with [your daughter]."   The detective also told Villalobos that "telling me the truth, and that's being, I didn't plan this, that makes it a lot better for you."   After this exchange, Villalobos admitted he had hit Ashley with a closed fist before Verdugo's dinner break, and he later admitted to striking Ashley repeatedly.

¶16     Villalobos argues that the phrases "not necessarily" and "that makes it a lot better for you" were implied promises for leniency.   Villalobos, however, had already admitted to striking Ashley before the detective made these statements.  *See State v. Lopez*, 174 Ariz. 131, 138, 847 P.2d 1078, 1085 (1992) (finding alleged inducement irrelevant when incriminating statement occurred beforehand).[3]   More importantly, the detective did not promise leniency.  *See Amaya-Ruiz*, 166 Ariz. at 165, 800 P.2d at 1273 ("Mere advice from the police that it would be better for the accused to tell the truth when unaccompanied by

---

[3]     Villalobos also cites a later statement by the second detective that "people get out of prison, nobody goes to jail for the rest of their life anymore especially when it's not something they plan."   Whatever the propriety of these remarks, however, Villalobos made no subsequent incriminating statements. *See Lopez*, 174 Ariz. at 138, 847 P.2d at 1085.

7

either a threat or a promise does not render a subsequent confession involuntary."); *State v. Walton*, 159 Ariz. 571, 579, 769 P.2d 1017, 1025 (1989) (finding statements by detective that defendant needed to tell the truth to "give yourself a chance" not coercive).

### 2. Other Acts Evidence

**¶17** Villalobos argues the trial court erred in admitting the following evidence: (1) testimony that he had violently shaken Ashley in October 2003; (2) his admission that he had bruised Ashley's face and buttocks in November 2003; (3) his admission that he had bruised Ashley's face in December 2003; and (4) his admissions to Verdugo that he had bruised Ashley's arms in the weeks before her death.

**¶18** Evidence of "other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Ariz. R. Evid. 404(b). Such evidence may, however, be admitted "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* We review the superior court's decision to admit other acts evidence for abuse of discretion. *State v. Andriano*, 215 Ariz. 497, 502 ¶ 17, 161 P.3d 540, 545 (2007).

**¶19** The child abuse charge required proof that Villalobos "intentionally or knowingly" injured Ashley. *See* A.R.S. § 13-

8

3623(A)(2) (2001). The prior abuse evidence was relevant to establish Villalobos's mental state. *See State v. Smith*, 130 Ariz. 74, 76, 634 P.2d 1, 3 (App. 1981) (admitting evidence of prior abuse to establish defendant's mental state). This evidence also rebutted Villalobos's claim that he did not intend to hurt Ashley and hit her as a "reflex," as well as his contention that Verdugo could have caused the fatal injuries.

¶20 In light of Villalobos's defenses, the superior court did not abuse its discretion in concluding that the probative value of the other acts evidence was not substantially outweighed by the danger of unfair prejudice. *See* Ariz. R. Evid. 403; *see also State v. Roque*, 213 Ariz. 193, 212 ¶ 59, 141 P.3d 368, 387 (2006) (reviewing Rule 403 ruling for abuse of discretion). The prior abuse occurred in October, November, and December of 2003, shortly before the fatal attack. Any prejudice from the admission of this evidence was appropriately mitigated by the instruction given at Villalobos's request, which reminded the jury of the limited purposes for which it could consider the other acts evidence. *See* Ariz. R. Evid. 105 (requiring that, upon request, a trial court give a limiting instruction when evidence is admissible for one purpose but not another); *State v. Hyde*, 186 Ariz. 252, 276-77, 921 P.2d 655, 679-80 (1996) (stating that an offer to issue limiting

instruction "afforded the defendant adequate protection against unfair prejudice").

### 3. Autopsy Photographs

¶21     Villalobos claims the trial court erred in admitting four autopsy photographs depicting various internal injuries. Autopsy photographs are admissible to "show the nature and location of the fatal injury, to help determine the degree or atrociousness of the crime, to corroborate state witnesses, to illustrate or explain testimony, and to corroborate the state's theory of how and why the homicide was committed." *State v. Chapple*, 135 Ariz. 281, 288, 660 P.2d 1208, 1215 (1983).  We review the trial court's admission of photographic evidence for abuse of discretion.  *State v. Cañez*, 202 Ariz. 133, 154 ¶ 65, 42 P.3d 564, 585 (2002).

¶22     The autopsy photographs were relevant to prove the cause of death and the extent of the abuse.  *See id*. at ¶ 66 (finding photographs relevant in proving murder); *Lopez*, 174 Ariz. at 138–39, 847 P.2d at 1085–86 (finding photographs relevant in proving abuse).  Each photograph illustrated a different aspect of the medical examiner's testimony.  This evidence was also relevant to rebut Villalobos's argument that Ashley seemed fine after the beating and his suggestion that she died because of lack of prompt medical attention.

10

¶23     Nor did the trial court abuse its discretion in concluding the risk of unfair prejudice from these photographs did not substantially outweigh their probative value. *See* Ariz. R. Evid. 403. "[T]here is nothing sanitary about murder, and there is nothing in Rule 403, Ariz. R. Evid., that requires a trial judge to make it so." *State v. Anderson*, 210 Ariz. 327, 340 ¶ 40, 111 P.3d 369, 382 (2005) (quoting *State v. Reinhardt*, 190 Ariz. 579, 584, 951 P.2d 454, 459 (1997)) (internal quotation marks omitted). The autopsy photographs depicted only internal injuries and were unlikely to cause undue prejudice when the underlying charges involved the beating death of a young child. *See Lopez*, 174 Ariz. at 139, 847 P.2d at 1078 (finding photographs of child autopsy not unduly prejudicial because "the crime committed was so atrocious that photographs could add little to the repugnance felt by anyone who heard the testimony" (internal quotation marks and citation omitted)).

## B. AGGRAVATION PHASE

### 1. Expert Testimony on the Victim's Suffering

¶24     The medical examiner testified during the aggravation phase that Ashley had suffered "excruciating" pain. Villalobos does not dispute that this testimony was relevant to prove the murder was especially cruel under A.R.S. § 13-751(F)(6). *See* *State v. Morris*, 215 Ariz. 324, 338 ¶ 61, 160 P.3d 203, 217 (2007) (holding that the (F)(6) cruelty aggravator requires

11

proof that the victim was "conscious and suffered physical pain or mental anguish during . . . some portion of the crime and that the defendant knew or should have known the victim would suffer"). Instead, he argues that the medical examiner was not qualified to testify on this subject because he was certified only in pathology and had not ascertained a patient's pain level for ten years.

¶25    Expert testimony is appropriate "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue." Ariz. R. Evid. 702. A witness can qualify as an expert through requisite "knowledge, skill, experience, training, or education." *Id.* We review the admission of expert testimony for abuse of discretion. *State v. Davolt*, 207 Ariz. 191, 210 ¶ 69, 84 P.3d 456, 475 (2004).

¶26    The superior court did not abuse its discretion in allowing the medical examiner to testify about the victim's pain. The medical examiner had extensive medical training and experience in China, had completed two fellowships and a pathology residence in the United States, and, in addition to conducting autopsies, had treated live patients during his fellowships.

¶27    The medical examiner's specialization in pathology did not disqualify him from giving expert testimony on pain. *See*

12

*Morris*, 215 Ariz. at 338 ¶ 61, 160 P.3d at 217 (involving pathologist testimony of pain levels); *State v. Sansing*, 206 Ariz. 232, 236 ¶ 12, 77 P.3d 30, 34 (2003) (same); *State v. Maturana*, 180 Ariz. 126, 132, 882 P.2d 933, 939 (1994) (same). Instead, the physician's certification went only to the weight of his testimony. *See Davolt*, 207 Ariz. at 210 ¶ 70, 84 P.3d at 475.

## 2. Double Counting of Victim's Age

¶28    Villalobos contends that the prosecutor's description of Ashley as "tiny," "32 pound[s]," a "child," and "five years old" in his closing argument improperly encouraged the jury to weigh her age twice in finding the (F)(6) and (F)(9) aggravators.    A jury may use one fact to find multiple aggravators, but it may not weigh the same fact twice when assessing aggravation and mitigation. *State v. Velazquez*, 216 Ariz. 300, 307 ¶ 22, 166 P.3d 91, 98 (2007).

¶29    Villalobos has not demonstrated impermissible double counting.    The prosecutor's comments regarding Ashley's age, size, weight, and references to her as a child appropriately encouraged the jury to consider whether she was helpless at the time of the murder.    *See State v. Bolton*, 182 Ariz. 290, 310 n.6, 896 P.2d 830, 850 n.6 (1995) (evaluating child's defenselessness as part of (F)(6) aggravator).    The prosecutor expressly told the jury that it could consider physical size as

13

evidence of helplessness, but emphasized that he was "talking about her size, not her chronological age." This Court has found similar comments appropriate in cases involving both the (F)(6) and (F)(9) aggravators. *See Velazquez*, 216 Ariz. at 307 ¶ 23, 166 P.3d at 98; *State v. Medina*, 193 Ariz. 504, 512 ¶ 26, 975 P.2d 94, 102 (1999). Moreover, the jury was expressly instructed not to consider age when determining whether the crime was especially heinous, cruel or depraved. *See Velazquez*, 216 Ariz. at 307 ¶ 24, 166 P.3d at 98 (citing such an instruction in rejecting double-counting argument).

### 3. Narrowing Instructions

¶30 Arizona's (F)(6) "especially heinous, cruel or depraved" aggravator is unconstitutionally vague. *Walton v. Arizona*, 497 U.S. 639, 654 (1990), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584, 589 (2002). However, this vagueness is remedied when "jury instructions provide adequate specificity in accordance with appellate courts' narrowing constructions." *Anderson*, 210 Ariz. at 353 ¶ 114, 111 P.3d at 395.

¶31 Villalobos did not object to the aggravation phase (F)(6) instruction and concedes on appeal that it accurately stated Arizona law.[4] But, he argues, the instruction does not

---

[4] The aggravation phase jury instructions described the especially cruel prong of the (F)(6) aggravator as follows:

14

cure the vagueness of the (F)(6) aggravator because the term "especially" was not properly defined. We have repeatedly rejected similar arguments, holding that jury instructions materially identical to those here sufficiently narrowed the "especially cruel" aggravator. *See State v. McCray*, 218 Ariz. 252, 258-59 ¶¶ 25-26 & n.3, 183 P.3d 503, 509-10 & n.3 (2008); *Velazquez*, 216 Ariz. at 308 ¶¶ 28-29, 166 P.3d at 99; *State v. Cromwell*, 211 Ariz. 181, 189-90 ¶¶ 42-45, 119 P.3d 448, 456-57 (2005); *Anderson*, 210 Ariz. at 353 ¶ 114 & n.19, 111 P.3d at 395 & n.19.

## C. PENALTY PHASE

### 1. Refusal to Pose Juror Question

¶32    After redirect of the State's mental health expert in the sentencing phase, a juror submitted the following question to the trial judge: "Given what you know about Mr. Villalobos, is it likely that he could be significantly reformed with the help of medications and or therapy?" Over Villalobos's

––––––––––––––––––––––––––

> The term "cruel" focuses on the victim's pain and suffering. To find that the murder was committed in an "especially cruel" manner you must find that the victim consciously suffered physical or mental pain, distress or anguish prior to death. The Defendant must know or should have known that the victim would suffer.

The jury was further instructed that the State had to prove that the cruelty in this murder was "unusually great or significant" to make it "especially cruel."

objection, the judge refused to ask the expert that question because "talking about [a] speculative theoretical future environment . . . doesn't seem to fall within the realm of what mitigation is about."

¶33    A trial judge may "for good cause . . . prohibit or limit the submission of [juror] questions to witnesses."  Ariz. R. Crim. P. 18.6(e).  We review the trial court's decision to exclude evidence for abuse of discretion.  *See State v. Ellison*, 213 Ariz. 116, 129 ¶ 42, 140 P.3d 899, 912 (2006); *Davolt*, 207 Ariz. at 210 ¶ 69, 84 P.3d at 475.

¶34    A penalty phase jury may not be precluded from considering relevant mitigating evidence.  *See Tennard v. Dretke*, 542 U.S. 274, 287 (2004); *Eddings v. Oklahoma*, 455 U.S. 104, 114-15 (1982).  Our statutes broadly define "mitigating circumstances" as including "any aspect of the defendant's character, propensities or record."  A.R.S. § 13-751(G).  A defendant's potential for future rehabilitation falls squarely within this definition.  *State v. King*, 180 Ariz. 268, 283, 883 P.2d 1024, 1039 (1994).  The trial judge therefore incorrectly concluded that future dangerousness and potential for rehabilitation were not mitigating circumstances.

¶35    Nonetheless, we cannot conclude that the trial judge committed reversible error in declining to pose the juror's question to the State's expert.  The witness had testified only

16

as to the results of a personality test and Villalobos's I.Q. score; he did not diagnose the defendant for treatment, nor was his expertise on the effects of medication or therapy established.

¶36    More importantly, Villalobos made no offer of proof as to what the expert would have said if allowed to answer the question.  A finding of error "may not be predicated upon a ruling which . . . excludes evidence unless . . . the substance of the evidence was made known to the court by offer or was apparent from the context."  Ariz. R. Evid. 103(a)(2); *see State v. Towery*, 186 Ariz. 168, 179, 920 P.2d 290, 301 (1996) (requiring, "[a]t a minimum, an offer of proof stating with reasonable specificity what the evidence would have shown").  Unlike cases in which no offer of proof is necessary because the content of the excluded evidence is obvious, *e.g.*, *State v. Kaiser*, 109 Ariz. 244, 246, 508 P.2d 74, 76 (1973), nothing in this record hints at what the expert's response to the juror's question would have been.  We therefore cannot conclude the judge's ruling was erroneous.

### 2. Comments Regarding Causal Nexus

¶37    During his penalty phase closing argument, the prosecutor stated:

> [T]he bottom line on that abuse [Villalobos suffered],
> if it happened, is what does it have to do with the
> murder of Ashley Molina?  What does it have to do with

17

repeatedly punching her in the stomach?  What does it have to do with letting her die those slow two to four hours?  The bottom line question is what about his childhood reduces his moral[] culpability or blameworthiness for all the decisions he made on January 3, 2004?

. . . .

[T]he defense team asserts that his borderline IQ is mitigating . . . .  [H]e did have learning disability in reading and mathematics, but what does this have to do with the murder of Ashley Molina?

. . . .

This is the fabric of who he is.  And I submit to you there is absolutely nothing mitigating about who he is in light of what you've seen him do, what you've seen demonstrated in this case.

Villalobos argues that these comments improperly suggested that a "causal nexus" was required between the crime and any mitigating evidence.

¶38    A jury cannot be precluded from hearing mitigation evidence because it lacks a causal nexus to the murder. *Tennard*, 542 U.S. at 284-87.  However, "there is no constitutional prohibition against the State arguing that evidence is not particularly relevant or that it is entitled to little weight."  *Anderson*, 210 Ariz. at 350 ¶ 97, 111 P.3d at 392; *see also State v. Pandeli*, 215 Ariz. 514, 525-26 ¶¶ 31-32, 161 P.3d 557, 568-69 (2007).  The jury may thus appropriately consider a lack of causal nexus when "assessing the quality and

18

strength of mitigation." *Newell*, 212 Ariz. at 405 ¶ 82, 132 P.3d at 849.

¶**39** Villalobos does not claim that the trial court excluded any evidence for lack of a causal nexus. Rather, he objects to the prosecutor's comments. We have repeatedly held, however, that the state may fairly argue that the lack of a nexus to the crime diminishes the weight to be given alleged mitigation. *See, e.g.*, *Anderson*, 210 Ariz. at 392 ¶ 97, 111 P.3d at 350; *Pandeli*, 215 Ariz. at 525-26 ¶ 31, 161 P.3d at 568-69. Thus, the statements here were not improper. Moreover, the jury was properly instructed that it could consider any relevant evidence as mitigation and that it alone should determine the weight to attach to that mitigation. *See Pandeli*, 215 Ariz. at 526 ¶ 36, 161 P.3d at 569; *Roque*, 213 Ariz. at 224 ¶ 126, 141 P.3d at 399.

¶**40** Villalobos also argues that A.R.S. § 13-751(G) unconstitutionally requires a causal nexus between mitigation and the crime. This is incorrect. Relevance, not a causal nexus, is the only statutory limitation on the jury's ability to consider mitigation evidence. A.R.S. § 13-751(G); *see Anderson*, 210 Ariz. at 350 ¶ 97, 111 P.3d at 392 (noting distinction between admissibility and the weight given mitigation).

19

**D. REVIEW OF THE DEATH SENTENCE**

¶41    Because the murder occurred after August 1, 2002, we review both the jury's aggravation findings and the death sentence for abuse of discretion. A.R.S. § 13-756(A) (2010); *Morris*, 215 Ariz. at 340 ¶ 76, 160 P.3d at 219. A jury has not abused its discretion in finding an aggravating circumstance or determining that death is the appropriate sentence if there is "any reasonable evidence in the record to sustain" those conclusions. *Morris*, 215 Ariz. at 341 ¶ 77, 160 P.3d at 220 (internal quotation marks and citation omitted).[5]

**1. Aggravation Phase**

**a. (F)(6) Aggravator**

¶42    Villalobos argues that the State has not met its burden of proving the murder was especially cruel because it did not establish that Ashley was conscious at all times after first being struck. The especially cruel prong of the (F)(6)

---

[5]    A defendant may not be sentenced to death under the Eighth Amendment unless he "kill[s], attempt[s] to kill, or intend[s] that a killing will take place or that lethal force will be employed," *Enmund v. Florida*, 458 U.S. 782, 797 (1982), or is a major participant in a crime and acts with reckless indifference to human life, *Tison v. Arizona*, 481 U.S. 137, 158 (1987). The trial court in this case did not ask the jury to make an *Enmund/Tison* finding. *See* A.R.S. § 13-752(P) (2010) (requiring jury to make all factual determinations required by the "Constitution of the United States or this state to impose a death penalty"). Villalobos did not request an *Enmund/Tison* finding below, nor does he raise this as an issue on appeal. In any event, the evidence below overwhelmingly established that Villalobos was the actual killer.

20

aggravator, however, does not require the victim to be conscious for all injuries inflicted. *McCray*, 218 Ariz. at 259 ¶ 31, 183 P.3d at 510.

¶43    The State presented substantial evidence that Ashley suffered and that Villalobos knew or should have known she was suffering.  Villalobos admitted that he beat Ashley at approximately 5 p.m.  Ashley was conscious until going to bed around 1 a.m., thus suggesting she was also conscious during the fatal beating and suffered its effects while conscious.  The medical examiner also testified that Ashley was conscious after she was punched and would have been in pain comparable to that from a ruptured appendix.  Therefore, the jury properly found the (F)(6) aggravator.  *See Morris*, 215 Ariz. at 338 ¶ 61, 160 P.3d at 217.

¶44    "A finding of cruelty alone is sufficient to establish the (F)(6) aggravator."  *Id*. at 341 ¶ 80, 160 P.3d at 220. Moreover, Villalobos does not challenge the jury's separate finding that the murder was especially heinous or depraved.  The jury was appropriately instructed, without objection from Villalobos, that it could find heinousness or depravity under § 13-751(F)(6) if it concluded that the murder was senseless, the victim was helpless, and Villalobos had a caregiver relationship with the victim.  *See State v. Prince*, 206 Ariz. 24, 27 ¶ 10, 75 P.3d 114, 117 (2003); *State v. Styers*, 177 Ariz.

21

104, 116, 865 P.2d 765, 777 (1993). Ample evidence supported each of these findings. Thus, the (F)(6) aggravator was established independent of any finding of especial cruelty. *See State v. Djerf*, 191 Ariz. 583, 595 ¶ 44, 959 P.2d 1274, 1286 (1998) ("a finding of . . . heinousness/depravity will suffice to establish [the (F)(6)] factor").

### b. (F)(7) Aggravator

¶45 The State introduced uncontroverted evidence that Villalobos was on authorized release from prison for federal and state drug charges at the time of the offense. The jury therefore did not abuse its discretion in finding the (F)(7) aggravator.

### c. (F)(9) Aggravator

¶46 The State introduced uncontroverted evidence that Villalobos was twenty-one when he murdered Ashley, who was five. The jury therefore did not abuse its discretion in finding the (F)(9) aggravator.

**2. Penalty Phase**[6]

¶47    Villalobos presented four general categories of mitigation evidence in the penalty phase:  prior abuse, mental health, good behavior, and remorse.  His claimed mitigation, however, was subjected to significant rebuttal by the State. *See* A.R.S. § 13-751(D) (allowing state to present evidence rebutting claimed mitigation).

¶48    For example, although Villalobos alleged two incidents of childhood abuse by his father, evidence was also presented that his family was loving and supportive.  The jury was therefore entitled to disbelieve or discount the abuse allegations. *Cf*. *State v. Hampton*, 213 Ariz. 167, 185 ¶ 89, 150 P.3d 950, 968 (2006) (upholding death sentence despite evidence of childhood abuse); *State v. Wallace*, 160 Ariz. 424, 427, 773 P.2d 983, 986 (1989) (holding that a difficult family background does not necessarily mandate leniency).  Villalobos's mental health claims were similarly undermined by testimony, both from his own expert and the State's, that Villalobos's I.Q. fell within the normal range and he could tell right from wrong. *Cf.*

---

[6]    Villalobos does not argue that the jury abused its discretion in determining that any mitigating circumstances were not sufficiently substantial to warrant leniency.  Even when abuse of discretion review applies, appellate counsel should "take advantage of all appropriate opportunities to argue why death is not suitable punishment for their clients." *Morris*, 215 Ariz. at 341 ¶ 76 n.10, 160 P.3d at 219 n.10 (citation and internal quotation marks omitted).

*State v. Johnson*, 212 Ariz. 425, 440 ¶ 65, 133 P.3d 735, 750 (2006) (according mental health mitigation evidence "minimal weight" on independent review when defendant knew right from wrong and the evidence did not have a causal nexus to the crime).

¶49 Villalobos also argued below that he deserved leniency because he was a high school graduate and behaved properly in prison. The force of this claimed mitigation was diminished, however, by evidence that Villalobos was suspended from high school for excessive absences during a prior incarceration and was disciplined while in prison for threatening another inmate. *Cf. Pandeli*, 215 Ariz. at 533 ¶ 82, 161 P.3d at 576 (giving good prison behavior mitigation little weight on independent review because prisoners "are expected to behave and adapt to prison life").

¶50 Villalobos argued that the tapes of his police interview, during which he cried several times and told the polygrapher he was "sorry," demonstrate remorse. However, throughout the same interview, Villalobos deflected responsibility for Ashley's injuries by explaining the bruising on her body as the result of CPR, implying that Verdugo caused the bruising, justifying the beating as child discipline, excusing the beating as a "reflex," and refusing to acknowledge the extent of the harm he caused. *Cf. State v. Dann*, 220 Ariz.

351, 376 ¶ 150, 207 P.3d 604, 629 (2009) (according evidence of remorse little weight on independent review because defendant denied responsibility for his conduct). Villalobos's failure to get medical attention for Ashley after she vomited on him, his efforts to conceal her injuries from Verdugo, and his reluctance to take Ashley to the hospital because he feared he would be a suspect also tend to diminish the force of this claimed mitigation.

¶51 This case involves the senseless murder of a helpless child. Three aggravating circumstances were clearly established. On this record, even if we assume that Villalobos met his burden of establishing all claimed mitigation evidence by a preponderance of the evidence, we cannot conclude that the jury abused its discretion in determining that the mitigating circumstances, taken as a whole, were not sufficiently substantial to call for leniency. *See Morris*, 215 Ariz. at 341 ¶ 82, 160 P.3d at 220. We therefore affirm the death sentence.

### IV. CONCLUSION[7]

¶52 For the foregoing reasons, we affirm Villalobos's convictions and sentences.

---

[7] Villalobos also raises twelve claims about the death penalty to preserve them for federal review. These claims, and cases Villalobos represents have rejected his arguments, are set out verbatim in the Appendix. (The numbering of these claims has been changed to correct Villalobos's error in skipping the number five in his original numbering.)

25

　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　Andrew D. Hurwitz, Vice Chief Justice

CONCURRING:


_____
Rebecca White Berch, Chief Justice


_____
Michael D. Ryan, Justice


_____
W. Scott Bales, Justice


_____
A. John Pelander, Justice

**APPENDIX**

1. The fact-finder in capital cases must be able to consider all relevant mitigating evidence in deciding whether to give the death penalty. *See Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S. Ct. 2978, 49 L.Ed.2d 944 (1976). The trial court's failure to allow the jury to consider and give effect to all mitigating evidence in this case by limiting its consideration to that proven by a preponderance of the evidence is unconstitutional under the Eighth and Fourteenth Amendments. This court rejected this argument in *McGill*, 213 Ariz. at 161 ¶ 59, 140 P.3d at 944 (2006).

2. The State's failure to allege an element of a charged offense in the grand jury indictment-the aggravating factors that made the defendant death eligible-is a fundamental defect that renders the indictment constitutionally defective under the Fifth, Sixth, Eighth, and Fourteenth Amendments and Article 2, Section 1, 4, 13, 15, 23, and 24 of the Arizona Constitution. *See United States v. Chesney*, 10 F.3d 641, 643 (9th Cir. 1993); *see also Apperendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L.Ed.2d 435 (2000). This court rejected this argument in *McKaney v. Foreman ex rel. County of Maricopa*, 209 Ariz. 268, 273 ¶ 23, 100 P.3d 18, 23 (2004).

3. Both the United States and the Arizona Constitutions prohibit *ex post facto* laws. U.S. Const. Art. 1, § 10, cl. 1; Ariz. Const. art. 2, § 25. Application of the new death penalty law to defendant constitutes an impermissible *ex post facto* application of a new law. This Court rejected this argument in *State v. Ring*, 204 Ariz. 534, 547 ¶¶ 23-24, 65 P.3d 915, 928 (2003).

4. By allowing victim impact evidence at the penalty phase of the trial, the trial court violated defendant's constitutional rights under the Fifth, Sixth, Eight and Fourteenth Amendments and Article 2, Sections 1, 4, 13, 15, 23, and 24 of the Arizona Constitution. This Court rejected challenges to the use of victim impact evidence in *Lynn v. Reinstein*, 205 Ariz. 186, 191 ¶ 16, 68 P.3d 412, 417 (2003).

5. The trial court improperly omitted from the penalty phase jury instructions words to the effect that they may consider mercy or sympathy in deciding the value to assign the mitigation evidence, instead telling them to assign whatever value the jury deemed appropriate. The court also instructed the jury that they "must not be influenced by mere sympathy or by prejudice in determining these facts." These instructions limited the mitigation the jury could consider in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments and Article 2, Sections 1, 4, 15, 23, and 24 of the Arizona Constitution. This Court

28

rejected this argument in *State v. Carreon*, 210 Ariz. 54, 70-71 ¶¶ 81-87, 107 P.3d 900, 916-17 (2005).

6.   The death penalty is cruel and unusual in violation of the Eighth and Fourteenth Amendments, and Article 2, Section 15 of the Arizona Constitution.  This Court rejected this argument in *State v. Harrod*, 200 Ariz. 309, 320 ¶ 59, 26 P.3d 492, 503 (2001), *vacated on other grounds*, 536 U.S. 953, 122 S. Ct. 2653, 153 L.Ed.2d 830 (2002).

7.   The death penalty is irrational and arbitrarily imposed; it serves no purpose that is not adequately addressed by life in prison, in violation of the defendant's right to due process under the Fourteenth Amendment of the United States Constitution and Article 2, Sections 1 and 4 of the Arizona Constitution. This Court rejected these arguments in *State v. Beaty*, 158 Ariz. 232, 247, 762 P.2d 519, 534 (1988).

8.   The prosecutor's discretion to seek the death penalty lacks standards and therefore violates the Eighth and Fourteenth Amendments, and Article 2, Sections 1, 4, and 15 of the Arizona Constitution.  This Court rejected this argument in *State v. Sansing*, 200 Ariz. 347, 361 ¶ 46, 26 P.3d 1118, 1132 (2001), *vacated on other grounds*, 536 U.S. 954, 122 S. Ct. 2654, 153 L.Ed.2d 830 (2002).

9.   Arizona's death penalty is applied so as to discriminate against poor, young, and male defendants in violation of Article

29

2, Sections 1, 4, and 13 of the Arizona Constitution. This Court rejected this argument in *Sansing*, 200 Ariz. at 361 ¶ 46, 26 P.3d at 1132.

10. Proportionality review serves to identify which cases are above the "norm" of first-degree murder, thus narrowing the class of defendants who are eligible for the death penalty. The absence of proportionality review of death sentences by Arizona courts denies capital defendants due process of law and equal protection and amounts to cruel and unusual punishment in violation of the Fifth, Eighth, and Fourteenth Amendments, and Article 2, Section 15 of the Arizona Constitution. This Court rejected this argument in *Harrod*, 200 Ariz. at 320 ¶65, 26 P.3d at 503.

11. Arizona's capital sentencing scheme is unconstitutional because it does not require the state to prove the death penalty is appropriate or require the jury to find beyond a reasonable doubt that the aggravating circumstances outweigh the accumulated mitigating circumstances. Instead, Arizona's death penalty statute requires defendants to prove their lives should be spared in violation of the Fifth, Eighth, and Fourteenth Amendments and Article 2, Section 15 of the Arizona Constitution. This Court rejected this argument in *Pandeli*, 200 Ariz. at 382 ¶ 92, 26 P.3d at 1153.

30

12. Arizona's death penalty unconstitutionally requires imposition of the death penalty whenever at least one aggravating circumstance and no mitigating circumstances exist, in violation of the Eighth and Fourteenth Amendments, and Article 2, Section 15 of the Arizona Constitution. Arizona's death penalty law cannot constitutionally presume that death is the appropriate default sentence. This Court rejected this argument in *State v. Miles*, 186 Ariz. 10, 19, 918 P.2d 1028, 1037 (1996).