NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

GASPAR MATEO GASPAR, *Appellant*.

No. 1 CA-CR 21-0182
FILED 12-20-2022

Appeal from the Superior Court in Maricopa County
No.  CR2020-001746-001
The Honorable Jay R. Adleman, Judge
The Honorable Gregory S. Como, Judge

**AFFIRMED IN PART AS MODIFIED;
VACATED IN PART**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Eric Knobloch
*Counsel for Appellee*

Bain & Lauritano PLC, Glendale
By Amy E. Bain
*Counsel for Appellant*

_____

## MEMORANDUM DECISION

Judge Michael J. Brown delivered the decision of the Court, in which Presiding Judge Jennifer M. Perkins and Judge James B. Morse Jr. joined.

_____

**B R O W N**, Judge:

¶1         Gaspar Mateo Gaspar appeals his convictions and sentences on two counts of first-degree murder and one count each of kidnapping, tampering with physical evidence, and unauthorized burning of wildlands. He argues the superior court reversibly erred by refusing to suppress Facebook records acquired via a search warrant, admitting a purportedly inflammatory Facebook photo, and denying his motion for judgments of acquittal. For reasons that follow, we merge the murder convictions and vacate one of the resulting sentences, but otherwise affirm.

## BACKGROUND

¶2         Gaspar and Alfredo grew up together in the same Guatemalan town, but during the events involved in this case they lived primarily in Arizona. Alfredo was romantically involved with Jessica but disliked her male friend ("the victim"), whom she often drove to and from work. When Alfredo saw that the victim had sent Jessica a personal text message, Alfredo became angry and slapped her. Soon thereafter, the victim approached Alfredo's parked car to confront him and immediately began hitting the driver. The victim did not realize, however, that the driver was Gaspar and not Alfredo.

¶3         On July 17, 2016, Gaspar sent Facebook messages to the victim in response to the attack, stating he was ready "whenever [the victim] want[ed]" and taunting him about Alfredo and Jessica's intimate relationship. Two days later, Alfredo arrived at Jessica's home armed with a handgun and demanded to check the phone she was using. Once Alfredo saw that the victim had again sent her personal messages, he threatened Jessica and her daughter, and then ordered her to take him to the victim. They left in an SUV, picking up Gaspar on their way to the victim's workplace. While waiting for him leave work, Gaspar and Alfredo hid in the cargo area of the SUV. When the victim got into the front passenger seat, Alfredo jumped into the seat behind the victim, pointed the gun at him, and hit him repeatedly.

¶4        Alfredo ordered Jessica to drive away. Gaspar soon left the cargo area and sat next to Alfredo, who continued to strike the victim. During the drive, Gaspar and Alfredo spoke to each other in Q'anjob'al, a Guatemalan language that Jessica could not understand. They ultimately stopped at a remote creek bed in the Tonto National Forest. Alfredo and Gaspar marched the victim at gunpoint down a hill to a ravine while Jessica waited in the SUV. Jessica heard gunshots several minutes later, and Alfredo and Gaspar returned without the victim. The trio fled the area, stopping briefly so that Gaspar and Alfredo could hide the murder weapon.

¶5        The next morning, Alfredo, Gaspar, and Jessica returned to the same location. When they arrived at the creek bed, Alfredo and Gaspar walked down the hill carrying a gas can, and a few minutes later Jessica saw a cloud of smoke rising from the ravine. On their ride home, Alfredo and Gaspar again communicated in Q'anjob'al. Shortly thereafter law enforcement officers and other responders extinguished the fire and recovered two nine-millimeter shell casings near the victim's body. Police officers later identified the victim based on his partial palm print.

¶6        In the ensuing investigation, a detective acquired the victim's Facebook records and discovered the threatening messages from Gaspar. Based on that information, the detective obtained Gaspar's Facebook records via a search warrant. The records contained numerous audio messages, text messages, and photos about the victim's murder that Gaspar had sent to Daisy, a woman with whom he was romantically involved. Gaspar had also sent a series of Facebook messages to Daisy threatening to kill her and her children's father.

¶7        Gaspar's messages to Daisy included a photo depicting Gaspar's injured hand pointing at the victim's deceased, bloody body on the ground in the ravine. The photo was captioned, "Look what I did. Mission accomplished." After sending that photo, he left Daisy a voice message stating he shot the victim in the head and threatening to kill her and the father of her children. Gaspar also told Daisy that after killing the victim, "we went and burned [the body] to get rid of the evidence."

¶8        A detective eventually located Gaspar in federal custody and interviewed him. Gaspar told the detective that Jessica wanted Gaspar and Alfredo to beat up the victim, and if they refused, she would have the victim's gang come after them. He denied that he and Alfredo killed the victim and thought Jessica might have gone back to the ravine and shot him.

¶9      A grand jury indicted Gaspar on two counts of first-degree murder, class one felonies (Counts One and Two); kidnapping, a class two felony (Count Three); assault, a class one misdemeanor (Count Four); tampering with physical evidence, a class six felony (Count Five); and unauthorized burning of wildlands, a class six felony (Count Six).  Before trial, Gaspar moved to suppress his Facebook records, asserting the warrant (1) was defective because it "inaccurately state[d] that [the records were] believed to be 'In the County of Maricopa, State of Arizona'" when they were actually located "at the Facebook headquarters in Menlo Park, CA"; and (2) was overbroad, leading to the allegedly improper seizure of the audio messages.[1]

¶10      At the suppression hearing, the State introduced the search warrant, which stated in part that the sought-after accounts were "[m]aintained by the offices of Facebook, Inc. located in Menlo Park, California, which is now being utilized by subjects in the State of Arizona." The warrant further stated:

> In the County of Maricopa, State of Arizona there is now being concealed certain property or things described as: Subscriber information including but not limited to name, address, phone number, email, address, date/time stamp of account creation, date, log-in activity, Internet Protocol logs; and profile information including but not limited to profile contact information, notes, wall postings, photos, private messages, *etc.* with regards to [accounts].

The State called the detective who authored the search warrant; he testified about using the police's "standard format" in preparing the warrant. Although the detective did not know where the servers were located, he believed the requested information was in Maricopa County.  He served the warrant by uploading it "to a computer submission system, which is the only way Facebook will accept court process[,]" and he received the documents in a return email.  He listed Menlo Park in the warrant because "Facebook is internationally available. . . . [And] that's their headquarters."

---

[1]      Gaspar also unsuccessfully moved to suppress the search warrant on the ground that it constituted an illegal extraterritorial search.  Because he does not challenge that portion of the superior court's ruling, we do not address it.  *See State v. Bolton*, 182 Ariz. 290, 298 (1995) ("Failure to argue a claim on appeal constitutes waiver of that claim.").

¶11        Denying the suppression motion, the superior court explained that "[a]s for the 'place' requirement, the warrant identifies the electronic accounts of specific individuals, and their user names. The Court cannot imagine a more specific location[.]" The court also found that the warrant sufficiently specified the items to be seized because it "identifie[d] the ongoing homicide investigation as the reason for the warrant" and it restricted the request to a definite time frame.

¶12        Gaspar also moved to exclude a Facebook photo of him holding a handgun that he had posted on his Facebook account the night of July 17. The State argued the photo was relevant because the posting occurred a few days before the murder. A detective later testified that the gun in the photo was capable of firing nine-millimeter rounds, the same caliber as those recovered near the victim's body. In admitting the photo, the court found the post's timing gave it "probative value . . . that would outweigh any undue prejudice."

¶13        After the court denied Gaspar's motion for judgments of acquittal under Arizona Rule of Criminal Procedure ("Rule") 20 at trial, Gaspar testified that on the night of the victim's murder he received a phone call from Alfredo, who said he "was going to do something." Gaspar claimed that Alfredo, a "dangerous person" whom he feared, then "kidnapped" him. After seeing Alfredo shoot the victim, Gaspar thought he would be shot next, and Alfredo threatened to harm him and his family if he contacted the police.

¶14        Gaspar admitted to the jury he had repeatedly lied to the detective and "never once said [he was] afraid of Alfredo" during the interview. And he acknowledged sending Daisy the Facebook messages confessing to the crimes, maintaining he did so only to "scare her away." He testified he was not involved in the parked-car altercation with the victim and did not send him the threatening messages, suggesting Alfredo sent them.

¶15        The jury found Gaspar guilty on Counts One, Two, Three, Five, and Six, and the superior court acquitted him on Count Four. On Count Six, because the jury could not decide whether Gaspar had acted knowingly or intentionally in burning the wildlands, the court entered the judgment as a class one misdemeanor. At sentencing, the court ordered a terminal disposition on Count Six based on credit for time served. On the remaining counts, the court imposed concurrent prison terms, the longest of which was natural-life imprisonment on Count One. Gaspar timely appealed, and we have jurisdiction under A.R.S. § 12-120.21(A)(1).

## DISCUSSION

### A. Facebook Search Warrant

**¶16** Gaspar argues the superior court erred in denying his motion to suppress. He asserts the Facebook search warrant lacked sufficient particularity on the grounds that it (1) misidentified the "location to be searched" as Maricopa County rather than Menlo Park; and (2) provided only a "generic" description of the "items to be seized." We review suppression rulings for an abuse of discretion. *State v. Manuel*, 229 Ariz. 1, 4, ¶ 11 (2011). In our review, we consider only the evidence presented at the suppression hearing, viewing that evidence in the light most favorable to upholding the ruling. *Id.* We review de novo whether a search "complied with the dictates of the Fourth Amendment." *State v. Valle*, 196 Ariz. 324, 326, ¶ 6 (App. 2000).

**¶17** Search warrants must particularly describe the location to be searched and the persons or items to be seized. *State v. Ray*, 185 Ariz. 89, 92 (App. 1995); *see* U.S. Const. amend. IV. The particularity requirement safeguards against "a general, exploratory rummaging in a person's belongings" and thus prevents "the seizure of one thing under a warrant describing another." *Andresen v. Maryland*, 427 U.S. 463, 480 (1976) (citation omitted).

**¶18** The test to determine the sufficiency of the description is "whether the place to be searched is described with enough particularity to enable the executing officer to locate and identify the premises with reasonable effort, and whether there is any reasonable probability that another premise might be mistakenly searched." *State v. Coats*, 165 Ariz. 154, 159–60 (App. 1990). Courts must "consider the nature of the property sought to be recovered" in assessing whether a warrant is too general. *Ray*, 185 Ariz. at 93. Search warrants are presumed lawful, *State v. Crowley*, 202 Ariz. 80, 83, ¶ 7 (App. 2002), and a court should not declare a warrant invalid by interpreting affidavits in a "hypertechnical, rather than a commonsense, manner." *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (citation omitted).

**¶19** The search warrant here did not violate the particularity requirement. As the superior court concluded, the warrant sufficiently described the place to be searched—Gaspar's three Facebook accounts—by providing his name and user identification information. The warrant also specified that Gaspar was using his Facebook account in Arizona and the records were maintained in Menlo Park. Such information allowed the

Facebook agents who complied with the warrant to identify Gaspar's records without any reasonable probability of mistake or confusion. Nor does any record evidence suggest the agents had difficulty completing the task. Moreover, any mistake in the identification of the server's physical location would constitute only a technical error and thus not invalidate the warrant. *Cf. State v. Morgan*, 120 Ariz. 2, 3 (1978) (upholding a search warrant that included an incorrect street address and erroneous description of the targeted building's color).

**¶20** We also reject Gaspar's assertion that the phrases "but not limited to" and "*etc.*" rendered the search warrant fatally general. The warrant listed the victim's murder as the offense for which police sought the evidence and limited the request to records between July 1, 2016, and the date of the warrant's execution; therefore, it provided "a sufficiently specific definition to focus the search." *United States v. Hay*, 231 F.3d 630, 638 (9th Cir. 2000); *see State v. Moorman*, 154 Ariz. 578, 583 (1987) (explaining that open-ended phrases in warrants are constitutionally permissible if they are restricted to the specific crime under investigation). Our supreme court has repeatedly rejected similar challenges to warrant authorizations for even more broadly stated descriptions than the protested language here. *See, e.g.*, *State v. Lavers*, 168 Ariz. 376, 384 (1991) (upholding a warrant seeking specific items as well as "any and all evidence relating to" a murder).

**¶21** Finally, we agree with the superior court's implicit conclusion that seizure of the audio messages did not exceed the warrant's scope, given that the warrant requested all "private messages." A common sense reading of that term leads to the conclusion that it includes written and audio messages alike. *See Gates*, 462 U.S. at 236; *see also United States v. Banks*, 556 F.3d 967, 973 (9th Cir. 2009) (explaining that warrants need not "be tailored to obtain only that evidence already known to exist"). Gaspar has not shown the court abused its discretion in denying his suppression motion.

## B. Admissibility of Facebook Photo

**¶22** Gaspar contends the Facebook photo depicting him holding a handgun should have been excluded as irrelevant and unduly inflammatory. The admission of photographic evidence is reviewed for an abuse of discretion. *State v. Villalobos*, 225 Ariz. 74, 80, ¶ 21 (2010). A trial court "has considerable discretion in determining the relevance and admissibility of evidence." *State v. Amaya-Ruiz*, 166 Ariz. 152, 167 (1990).

¶23         In deciding whether to admit a photo, courts first examine whether it is relevant. *Id.* at 170. Photographic evidence is relevant when it helps the jury understand a disputed issue. *Id.* If relevant, the court decides "whether the photographs would tend to incite passion or inflame the jury" and if so, the court then "balances their probative value against their potential to cause unfair prejudice." *Id.* "Unfair prejudice results if the evidence has an undue tendency to suggest decision on an improper basis, such as emotion, sympathy, or horror." *State v. Mott*, 187 Ariz. 536, 545 (1997).

¶24         The superior court did not abuse its broad discretion by admitting the photo. First, it was relevant to showing Gaspar's involvement in the charged offenses, given that he posted the photo a few days before the murder and the handgun could fire the same rounds as those found near the victim's body. Also, he posted the photograph the night he sent the victim the threatening Facebook messages, suggesting a connection between those events. *See State v. Olquin*, 216 Ariz. 250, 253, ¶ 12 n.5 (App. 2007) (affirming for any reason supported by the record). Therefore, the evidence made Gaspar's culpability in committing the crimes at least somewhat more probable.

¶25         Second, Gaspar fails to identify, nor do we discern, anything inherently inflammatory about the publicly displayed image, which depicts only Gaspar's face and his hand gripping a gun. Nor would it tend to invite improper decision-making. This is particularly so here, given the nature of the accusations against Gaspar and the other properly admitted evidence the jury considered. *See State v. Lopez*, 174 Ariz. 131, 139 (1992) (finding autopsy photos were not inflammatory when "the crime committed was so atrocious that photographs could add little to the repugnance" of the charges) (quotation omitted). Gaspar has failed to show an abuse of discretion.

### C.    Rule 20 Motion

¶26         Gaspar challenges the superior court's denial of his Rule 20 motion, asserting he was "no more than a witness who was forced to be present during the crimes and was then threatened with his life and that of his family if he did not follow directives of [Alfredo]." We review the denial of a Rule 20 motion de novo. *State v. West*, 226 Ariz. 559, 562, ¶ 15 (2011).

¶27         Under Rule 20(a)(1), courts must enter a judgment of acquittal "if there is no substantial evidence to support a conviction." Substantial evidence is "such proof that reasonable persons could accept as adequate

and sufficient to support a conclusion of defendant's guilt beyond a reasonable doubt." *West*, 226 Ariz. at 562, ¶ 16 (citation omitted). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (citation omitted). "Reversible error based on insufficiency of the evidence occurs only where there is a complete absence of probative facts to support the conviction." *State v. Soto-Fong*, 187 Ariz. 186, 200 (1996). "There is no distinction in the probative value of direct and circumstantial evidence." *State v. Green*, 111 Ariz. 444, 446 (1975).

¶28 The crux of Gaspar's argument is that the State failed to prove his culpability as Alfredo's accomplice, asserting Alfredo was solely liable for the charged crimes and forced him to participate in the events. *See State v. Ellison*, 213 Ariz. 116, 134, ¶ 67 (2006) ("A defendant may be liable as an accomplice under A.R.S. § 13–303(A)(3) only for those offenses the defendant intended to aid or aided another in planning or committing.") (quotation omitted).

¶29 As recounted *supra* ¶¶ 3-10, the record evidence—including Gaspar's recorded messages confessing to the crimes and the "Mission accomplished" photo—supports a reasonable conclusion that Gaspar intentionally aided or assisted Alfredo in "knowingly restraining" the victim "with the intent to . . . inflict death [or] physical injury" on him, and thus caused the victim's death "in the course of and in furtherance of" the kidnapping. *See* A.R.S. § 13-1304(A)(3) (kidnapping); A.R.S. § 13-1105(A)(1) (felony murder). The evidence also shows they acted in concert when they burned the victim's body the next day, which in turn caused a brush fire. *See* A.R.S. §§ 13-2809(A)(1) (tampering with physical evidence), -1706(A) (burning of wildlands).

¶30 Substantial evidence also supports the premeditation element for first-degree murder. *See* A.R.S. § 13-1105(A)(1) (premeditated murder); *State v. Thompson*, 204 Ariz. 471, 479-80, ¶¶ 32-34 (2003) (explaining that premeditation requires proof of actual reflection, which may be established solely by circumstantial evidence). The jurors could draw a reasonable inference that Gaspar actually reflected on his actions from (1) the victim's attack on Gaspar and Gaspar's retaliatory messages shortly before the murder; (2) Gaspar's role in forcibly transporting the victim to a remote location; (3) hiding the murder weapon, then returning the next day to destroy the evidence; and (4) his claim that he had "accomplished" his "mission."

¶31 Gaspar's longstanding relationship with Alfredo bolsters the conclusion that they jointly committed the crimes. *See State v. Tison*, 129 Ariz. 546, 553 (1981) ("[I]ntent to engage in the criminal venture may be shown by the relationship of the parties and their conduct before and after the offense."). Based on that relationship, a rational juror could further infer they communicated in Q'anjob'al while committing the crimes so they could conceal their plans from Jessica and the victim. Moreover, the superior court instructed the jurors they could not find Gaspar guilty if they determined he was merely present when the crimes occurred, clarifying that accomplice liability could not be based solely on his presence at the crime scene. *See State v. Newell*, 212 Ariz. 389, 403, ¶ 68 (2006) ("We presume that the jurors followed the court's instructions.").

¶32 Gaspar's challenge fails because it is premised entirely on accepting the facts as he presented them in his trial testimony. The jurors were entitled to reject his account, just as they were free to credit Jessica's testimony that Alfredo never pointed the gun at Gaspar or otherwise forced him to assist in the commission of the crimes. *See State v. Clemons*, 110 Ariz. 555, 557 (1974) (explaining the jury is not compelled to believe the defendant's testimony). And in making its credibility determinations, the jury could properly consider the inconsistencies between Gaspar's trial testimony and the version of events he provided to the police, including the fact that he never claimed in his police interview that Alfredo had forced him to participate in the events. *See State v. Anderson*, 110 Ariz. 238, 241 (1973) ("When a defendant makes a statement at trial which is inconsistent with an earlier statement his credibility is clearly in question."). The superior court properly allowed the jury to decide Gaspar's culpability on each count.

### D. Multiplicitous Charges

¶33 As the State correctly notes, Gaspar's dual first-degree murder convictions and sentences for the death of a single victim are impermissibly multiplicitous. *See State v. Williams*, 232 Ariz. 158, 161, ¶ 10 (App. 2013) ("[T]he crime of murder of a single victim necessarily results in one [murder] conviction and one sentence."); *Merlina v. Jejna*, 208 Ariz. 1, 4, ¶ 12 (App. 2004) ("Charges are multiplicitous if they charge a single offense in multiple counts."). In these circumstances, the appropriate remedy is to merge the two convictions and vacate one of the sentences. *Merlina*, 208 Ariz. at 4, ¶ 14 n.4. Thus, we merge the convictions on Counts One and Two into a single conviction for first-degree murder and vacate Gaspar's life sentence on Count two.

## CONCLUSION

**¶34** We modify the convictions on Counts One and Two by merging them into a single conviction for first-degree murder, and we vacate the life sentence imposed on Count Two. We otherwise affirm Gaspar's convictions and sentences.

