IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

STATE OF ARIZONA,
*Appellee,*

*v.*

DAUNTORIAN LYDEL SANDERS,
*Appellant.*

No. CR-14-0302-AP
Filed September 13, 2018

Appeal from the Superior Court in Maricopa County
The Honorable Rosa Mroz, Judge
No. CR2009-157459
**AFFIRMED**

COUNSEL:

Mark Brnovich, Arizona Attorney General, Dominic E. Draye, Solicitor General, Lacy Stover Gard, Chief Counsel, Andrew S. Reilly (argued), Assistant Attorney General, Capital Litigation Section, Phoenix, Attorneys for State of Arizona

Michael S. Reeves (argued), Phoenix, Attorney for Dauntorian Lydel Sanders

JUSTICE GOULD authored the opinion of the Court, in which CHIEF JUSTICE BALES, VICE CHIEF JUSTICE BRUTINEL, and JUSTICES PELANDER, TIMMER, and BOLICK, and JUDGE CRUZ joined.[*]

---

[*] Justice John R. Lopez IV has recused himself from this case. Pursuant to article 6, section 3, of the Arizona Constitution, the Honorable Maria Elena Cruz, Judge of the Arizona Court of Appeals, Division One, was designated to sit in this matter.

JUSTICE GOULD, opinion of the Court:

**¶1**         Dauntorian Lydel Sanders was sentenced to death after a jury found him guilty of first degree murder and two counts of child abuse. We have jurisdiction of this automatic appeal pursuant to article 6, section 5(3), of the Arizona Constitution and A.R.S. § 13-4031. We affirm Sanders' convictions and sentences.

**I.**

**¶2**         On August 31, 2009, Sanders called 911 to report that his girlfriend's child, three-year-old Schala Vera, was not breathing.[1] A police officer went to the home, and Sanders directed him to an upstairs bathroom, where he found Schala lying on the floor. Schala's mother, Susan Witbracht, was kneeling over her, crying and begging Schala to breathe. The officer observed that Schala's skin was "very light blue in color," her mouth was open, and her eyes were "rolled back in her head." He also noticed that she was "heavily" bruised, particularly between her waist and her knees and from her shoulders to her elbows. The officer performed CPR on Schala until paramedics arrived and transported her to the hospital. The doctors could not revive Schala and she was pronounced dead at the hospital.

**¶3**         Chandler Police Detective Chris Keipert spoke with Sanders at the hospital. Sanders told Detective Keipert that he went to Walgreens to buy cigarettes and left Schala at home with Susan. When he returned to the house to retrieve his wallet, he checked on Schala, who was in the bathroom using the toilet, and "she was fine." He went back to Walgreens and was gone "[f]ive to ten minutes." When he returned home the second time, he checked on Schala again and she wasn't breathing. Sanders could not explain why Schala stopped breathing, claiming there had been no problems other than "the little girl won't eat her dinner."

**¶4**         When Detective Keipert asked Sanders about Schala's bruises, Sanders admitted they were "from when she got a spanking." He said the

---

[1] We view the facts in the light most favorable to sustaining the jury's verdict. *State v. Gunches* (*Gunches I*), 225 Ariz. 22, 25 ¶ 14 (2010).

spanking occurred around 9:00 p.m. the night before and that both he and Susan had spanked Schala with a "cloth-like belt." He claimed that was the last time she had been spanked.

¶5          Later that night, and continuing the following day, Detective Ivan Kaminsky interviewed Sanders at the Chandler Police Department. Initially, Sanders essentially repeated the story he had told Detective Keipert. Sanders added, however, that he and Susan had been punishing Schala by spanking her with a belt. He estimated that they would spank Schala "four or five" times "once or twice a week" with either a leather belt or a military belt. He said the discipline began "a couple weeks after" Schala returned to Arizona in late May or early June 2009 after living in Iowa with Susan's relatives for several months.

¶6          As the interview continued, Sanders' story changed. Sanders admitted that Schala was hit with a belt on the day of her death. He claimed that Susan struck Schala with a leather belt "maybe three or four" times for "not listening." He also stated that Schala's bruises on both her legs had been there since the Saturday before her death because both he and Susan struck her with a belt that day. Sanders maintained, however, that "[t]he only thing we use is a belt." He also denied hitting Schala with the buckle, because that was the part he held when he was hitting her. Sanders stated that he put tape around the buckle to protect his hand. During a search of the residence, police found a black belt with tape around the buckle on the bathroom counter. Sanders identified the belt as the one he used to strike Schala.

¶7          When Detective Kaminsky asked Sanders whose fault it was that Schala was beaten to death, Sanders stated that he would "take full blame" because he's the male and he's "more physical." Sanders also admitted that he "accidentally" hit Schala in the head with the bathroom door when he came home from Walgreens to get his wallet. He stated that he beat Schala shortly before he left for Walgreens because "she just didn't listen at all" and "just kept going." Sanders explained that Schala was supposed to be putting her underwear back on after using the toilet, "but she just sat there" on the bathroom floor. Because she was not listening to him, Sanders started hitting her legs with the belt. She tried to stand up but fell, and he continued to hit her. She then leaned forward with her face between her knees and he struck her on the back.

**¶8**       An autopsy was performed by Maricopa County Medical Examiner Kevin Horn, M.D. Dr. Horn found multiple abrasions on Schala's head and face. The autopsy revealed a subdural hemorrhage under her scalp that was, according to Dr. Horn, caused by "more than just an everyday force." Dr. Horn opined that the injury was similar to injuries caused by a fall from a significant height, a blow to the head, or a motor vehicle accident.

**¶9**       There were additional bruises and abrasions on Schala's torso and above and around her genitalia. Dr. Horn also found abrasions near Schala's left armpit, arms, back, buttocks, and thighs that he identified as "pattern injuries" consistent with a belt.

**¶10**       The most extensive bruising was to Schala's arms and legs. Dr. Horn noted "diffuse contusion" to those areas, meaning the bruises overlapped and "cover[ed] the entire surface." He also noted "very severe swelling of all four of her extremities." In both Schala's arms and legs, Dr. Horn diagnosed rhabdomyolysis, which he explained "is a long way of saying that the muscle has died and fallen apart." He also diagnosed compartment syndrome, which occurs when the muscle swells so much that it cuts off its own blood supply. Dr. Horn testified that compartment syndrome is typically seen in "victims of crushing trauma, like motor vehicle accidents, people that have been pinned in a wreckage" and in "earthquake areas where people have been crushed in buildings." Dr. Horn opined that it was not possible for a belt alone to have caused these injuries; rather, "[s]ignificant crushing force" must have caused the injuries to Schala's arms and legs. In his opinion, these injuries showed that Schala must have been squeezed, kicked, punched, and/or thrown against a surface or object in addition to being struck with a belt.

**¶11**       Dr. Horn took tissue samples from Schala's arms and legs and performed an iron stain test to try to determine the age of her bruises. On one section from her right leg he found "very rare microphages and very rare staining for iron" amongst "a sea of red blood cells," indicating "fresh injury possibly over an older injury." Because her legs were so extensively bruised he noted the newer bruises could be masking older bruises.

**¶12**       Ultimately, Schala's cause of death was determined to be "multiple blunt force injuries."

4

**¶13** Both Sanders and Susan were charged with first degree murder and four counts of child abuse (Susan's case was later severed from Sanders' case). The trial court later granted the State's motion to dismiss two counts of child abuse.

**¶14** At trial, the jury found Sanders guilty of first degree murder and two counts of child abuse. In the aggravation phase, the jury found three aggravating factors: (1) Sanders was previously convicted of a serious offense (child abuse), *see* A.R.S. § 13-751(F)(2); (2) the offense was committed in an especially heinous, cruel or depraved manner, *see id.* § 13-751(F)(6); and (3) Sanders murdered a child under fifteen years of age, *see id.* § 13-751(F)(9). Based on evidence that both Sanders and Susan beat Schala, the jury also made an *Enmund-Tison* finding that Sanders killed Schala. *See Enmund v. Florida*, 458 U.S. 782, 788 (1982); *Tison v. Arizona*, 431 U.S. 137, 157–58 (1986). In the penalty phase, after considering the mitigation evidence, the jury determined that Sanders should be sentenced to death. The trial court imposed consecutive presumptive sentences for the child abuse convictions.

## II.

### *Simmons* **Instruction**

**¶15** Sanders argues the trial court violated his rights under the Sixth, Eighth, and Fourteenth Amendments by instructing the jurors, over his objection, that a life sentence includes the "possibility of release from prison after serving 35 years." *See* A.R.S. § 13-751(A). Sanders claims that pursuant to *Simmons v. South Carolina*, 512 U.S. 154 (1994), the trial court reversibly erred by failing to instruct the jury that he was ineligible for release or parole. "We review de novo whether the court properly instructed the jury." *State v. Rushing*, 243 Ariz. 212, 221 ¶ 36 (2017).

**¶16** In *Simmons*, the United States Supreme Court held that if "the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible." 512 U.S. at 156 (plurality opinion); *see also id.* at 178 (O'Connor, J., concurring). In *Kelly v. South Carolina*, 534 U.S. 246, 248 (2002), the Court stated that a defendant's future dangerousness is at issue if it is "'a logical inference from the evidence,' or was 'injected into the case through the State's closing argument.'" *Id.* at 252 (quoting *State v. Kelly*, 540 S.E.2d 851, 857 (S.C. 2001));

5

*see also State v. Escalante-Orozco*, 241 Ariz. 254, 285 ¶ 119 (2017) (holding that the "prosecutor [does] not have to explicitly argue future dangerousness for it to be at issue; instead, it is sufficient if future dangerousness is 'a logical inference from the evidence' or is 'injected into the case through the State's closing argument'" (citation omitted)).

**¶17** Sanders is not eligible for parole and cannot be released from prison unless his sentence is commuted by the Governor. *See* A.R.S. § 41-1604.09(I) (2009) (stating section regarding parole eligibility "applies only to persons who commit felony offenses before January 1, 1994"); *Lynch v. Arizona*, 136 S. Ct. 1818, 1819–20 (2016) (holding that the possibility a defendant could be eligible for executive clemency does not justify refusing a parole-ineligibility instruction). Accordingly, if Sanders' future dangerousness was at issue, the trial court's erroneous instruction violated his due process right to inform the jury that he was ineligible for parole or release.

*Future Dangerousness*

**¶18** In a capital case, placing future dangerousness at issue invites the jury to assess whether the defendant's propensity for violence is so great that imposing death is the only means to protect society. *See California v. Ramos*, 463 U.S. 992, 1003 (1983). Here, because there are significant factual differences between Sanders' case and those cases where a defendant's future dangerousness was at issue, we conclude the trial court's instruction did not violate Sanders' due process rights.

**¶19** Significantly, Sanders had no prior arrests or convictions for violent acts, and there is no evidence that he had a history of violent or assaultive behavior. In contrast, future dangerousness is usually placed at issue when evidence is presented to the jury demonstrating the defendant's propensity for violence and unlawful behavior. *See, e.g.*, *Kelly*, 542 U.S. at 249, 252–53 (holding the jury was invited to consider the defendant's future dangerousness based on testimony that defendant created a shank while in prison and made an escape attempt that included a plan to lure a female guard into his cell to be used as a hostage, as well as testimony by the State's psychologist that the defendant was a sadist as a child and had developed an inclination to kill anyone "who rubbed him the wrong way"); *Rushing*, 243 Ariz. at 222 ¶¶ 40–41 (finding future dangerousness was placed at issue based on evidence that defendant "shot his stepfather in the back of the head, killing him while he slept"; "threatened officers and got into fights in

prison"; hid "two shanks [] inside his rectum" while in prison; and that the prosecutor elicited testimony "from a prison expert that [defendant] was affiliated with the Aryan Brotherhood, once planned to form a Skinhead group 'to bring things back in order' in Prescott upon release from prison, and accumulated disciplinary violations, including threats to kill corrections officers"); *Escalante-Orozco*, 241 Ariz. at 285 ¶ 121 (stating that defendant's future dangerousness was at issue when, during the penalty phase, the prosecutor presented evidence that the defendant "choked his ex-wife" and "threatened her life" by holding a "knife to her throat"; threatened his ex-wife by biting off "part of someone's finger in a fight" and showing it to her; and, on another occasion, fought with his ex-wife, "tore off her clothes, threatened her with a knife, and dragged her outside by her hair while she was naked").

¶20 The circumstances surrounding Schala's murder did not place Sanders' future dangerousness at issue by suggesting that the death penalty was the only means to protect society. *See Ramos*, 463 U.S. at 1003. The record shows that Sanders committed this murder in the context of a specific domestic situation that came to a head in the summer of 2009. Specifically, at the time of the murder, Sanders was living in cramped, stressful conditions in his mother's house, where neither Schala nor Susan were welcome; Sanders and Susan were chronically unemployed, causing severe financial distress; Susan had abdicated parenting responsibilities, thrusting Sanders into the role of the sole responsible parent; and Sanders was suffering from undiagnosed, untreated PTSD.

¶21 Unlike Sanders' case, cases before this Court involving future dangerousness have entailed a random or predatory murder involving a stranger who had the misfortune of crossing the defendant's path. *See, e.g.*, *State v. Hulsey*, 243 Ariz. 367, 375 ¶¶ 2–5 (2018) (following a traffic stop, the defendant, who was a passenger in the car and had an outstanding warrant, opened fire and killed a police offer when the officer asked him to step out of the car); *Rushing*, 243 Ariz. at 216 ¶¶ 2–6 (defendant beat and stabbed his prison cellmate after a few weeks of being housed together); *Escalante-Orozco*, 241 Ariz. at 265 ¶¶ 2–5 (defendant, a live-in maintenance worker at an apartment complex, beat, raped, and stabbed a resident, and then sold his car and fled to Mexico, remaining at-large for over six years). In such cases, the inference that the defendant posed a danger to society was far stronger than in Sanders' case.

¶22        Sanders claims, however, that there was evidence, extrinsic to Schala's murder, showing his propensity for violence. Specifically, Sanders points to evidence that (1) he was investigated for rape while he was in the Marine Corps, and (2) he was involved in a "choking" incident with Susan.

¶23        The rape investigation was referenced during the testimony of Dr. Smith, a mitigation expert who testified about Sanders' PTSD. Dr. Smith testified that his evaluation and diagnosis of Sanders were based largely on Sanders' self-reporting. At one point during his examination, defense counsel asked Dr. Smith whether Sanders had advised him that "while he was in California he was charged with an offense" and "those charges were dropped." Dr. Smith testified that Sanders had reported this incident but did not disclose the nature of the charges.

¶24        The State attempted to impeach Dr. Smith's PTSD diagnosis. To do so, the prosecutor asked a series of questions about Sanders' purported lack of full disclosure during his examination. In line with this questioning, at one point the prosecutor asked Dr. Smith if Sanders had disclosed that his prior criminal investigation was for rape. Dr. Smith stated that Sanders had not.

¶25        The prosecutor's question to Dr. Smith did not elicit information or itself suggest that Sanders was in fact a rapist or had a propensity for violence. We recognize that the prosecutor should have been more careful about this question's potentially prejudicial impact. However, this isolated question was the only reference to the rape investigation, and the prosecutor never argued or discussed it in her closing argument. This fleeting episode did not create a specter of future dangerousness.

¶26        The "choking incident" was introduced by defense counsel during her direct examination of Susan's cousin, Bianca Smallwood. Defense counsel presented this testimony as part of Sanders' mitigation evidence. Specifically, in questioning Bianca, defense counsel sought to establish the stressful domestic circumstances that led to Schala's murder. *See supra* ¶ 20. In this context, defense counsel asked Bianca about an incident where Susan threw Sanders' expensive remote-control helicopter across the room, and Sanders reacted by "grabb[ing] her by the throat."

¶27        Bianca testified that this was the only time she saw Sanders exhibit any violence toward Susan.  Additionally, the prosecutor sought to establish that the incident never occurred.  On cross-examination the State sought to show when Bianca claimed this incident occurred, Sanders could not afford an expensive remote-control helicopter.  The State also presented testimony from Detective Kaminsky that (1) no report was made to the police about this incident, and (2) there were no police reports regarding *any* other domestic violence incidents occurring between Sanders and Susan.

¶28        The State never argued that the helicopter incident showed that Sanders was a violent or dangerous person.  Indeed, the State argued that the incident, if it occurred, was an anomaly in Sanders' relationship with Susan, and that everything between them appeared to be "fine." The sole reference the State made to the incident stressed this fact:

> Ladies and gentlemen, [Sanders and Susan] both expressed a desire to see each other.  This was not a relationship the defendant was in because Susan had forced him to be into it.  He wanted to be into it.  He had a desire to marry her.  The only thing standing in his way was a lack of money.  He described his relationship with Susan as good.  It was a little rocky because they had financial concerns at that time.  It's also important, and I bring up the point of Bianca Smallwood because the defense brought her up in their first close.  And what she said is that when they were together, they appeared fine, with the exception of this whole choking incident, with what she describes as really a mutual combat issue, that Susan had provoked the defendant, and he reacted.  And she talks about how the defendant cared for Schala.

¶29        Sanders also argues that the State placed his future dangerousness at issue by emphasizing the brutality of the murder.  We disagree.

¶30        The prosecutor never suggested that based on the brutality of the murder, Sanders posed a danger to society.  Rather, in describing the murder and Sanders' conduct as "horrific," "cold," "ruthless," "callous," and "mean," the prosecutor argued for retribution, focusing the jury's attention on the "moral outrage" and "affront to humanity" of Sanders'

conduct. *See Gregg v. Georgia*, 428 U.S. 153, 183–84 & nn.29–30 (1976). In her closing argument the prosecutor emphasized that Sanders deserved the death penalty as punishment for beating Schala to death:

> Now, in closing, I would like to talk to you about what you're being asked to do here today. In society, we often want to believe there has to be something mentally wrong with someone who could commit such an act of violence against such an innocent person, a little child. Wouldn't we want to believe that a person must have had a horrible childhood to cause them to commit such a terrible act? That there must have been some event in that person's life that led them to brutalize a human being. But, ladies and gentlemen, as Dr. Seward alluded to, *sometimes people just do bad things*. And that's what the evidence in this case has shown.
>
> *This defendant is a normal, intelligent person*. He had a normal upbringing. You have seen a binder full of memories from birth into adulthood . . . .
>
> *But Schala's death could have been prevented*. All it would have required is that he stopped. When he saw those bruises forming on her body, that he stopped. And he chose not to. And *for that*, ladies and gentlemen, he does deserve the ultimate punishment, the death penalty. Ladies and gentlemen, *the State is asking you to impose a just sentence for what this defendant did to Schala*.

(emphasis added). *See Commonwealth v. Chmiel*, 889 A.2d 501, 537–38 (Pa. 2005) (finding prosecutor's arguments focusing on the brutality of the murders, and imposing death as retribution for the inhumanity of the murders, as opposed to defendant's propensity for violence, did not place future dangerousness at issue).

¶31        In contrast, in many cases finding future dangerousness was at issue, the prosecutor argued that the defendant's propensity for violence was so great that, if released from prison, he would pose a continuing threat to society. *See, e.g.*, *Kelly*, 534 U.S. at 249–50 (during his closing argument, the prosecutor compared the defendant to a serial killer, stating that he was dangerous and unpredictable, and referred to him as "the butcher of

Batesburg," "Bloody Bill," and "Billy the Kid," and at the end of his argument, remarked that "murderers will be murderers [and the defendant] is the cold-blooded one right over there"); *Simmons*, 512 U.S. at 157; *id.* at 175–76 (O'Connor, J., concurring) (holding that future dangerousness was at issue where the State argued that the defendant was "a vicious predator who would pose a continuing threat to the community," the jury had to decide "what to do with [defendant] now that he is in our midst," and "[y]our verdict should be a response of society to someone who is a threat. Your verdict will be an act of self-defense"); *Hulsey*, 243 Ariz. at 395 ¶¶ 130–31 (holding the state placed the defendant's future dangerousness at issue when, during the penalty phase, "the prosecutor discussed [defendant's] proclivity throughout his life to get into fights, stating, '[h]e just gets angry and wants to beat people up, whether he is high or not,' and, '[i]f you don't agree with him, he will explode,'" he "recounted testimony that [defendant] 'likes to see when you put a firecracker in a cat's anus just so you can see the entrails flow out as the cat dies,'" and the "prosecutor repeatedly mentioned how an expert who contacted [defendant] was afraid of him and felt threatened," and "elicited testimony that when previously incarcerated, [defendant] had choked a fellow inmate and threatened the inmate and other inmates who saw the incident").

¶32　　　Accordingly, based on the record in this case, Sanders' future dangerousness was not at issue, nor was it a logical inference from the evidence. Therefore, no *Simmons* error occurred.

## Eligibility of Juror 19

¶33　　　Sanders claims that he was deprived of a jury of twelve qualified jurors because Juror 19, who was later empaneled as the presiding juror, was a convicted felon and therefore ineligible to serve on the jury. Juror 19 stated in his written questionnaire that he had been "convicted of a white-collar crime" in 2004. The juror later advised the trial court during voir dire that his civil rights had been restored. Sanders claims, however, that this was a lie, as "proved" by the fact the juror applied to have his civil rights restored during the trial.

¶34　　　Contrary to Sanders' assertion, the alleged error does not fall into any of the "relatively few" recognized categories of structural error. *See State v. Ring*, 204 Ariz. 534, 552–53 ¶¶ 45–46 (2003). Moreover, as

Sanders' counsel conceded at oral argument, a criminal defendant has no constitutional right to a jury composed of non-felons. *See Coleman v. Calderon*, 150 F.3d 1105, 1117 (9th Cir. 1998), *rev'd on other grounds*, 525 U.S. 141 (1998); *People v. Miller*, 759 N.W.2d 850, 864 (Mich. 2008).

¶**35**     In addition, Sanders' reliance on *State v. Anderson* (*Anderson I*), 197 Ariz. 314, 323–24 ¶ 22 (2000), is misplaced. In *Anderson I*, the trial court removed three jurors because they expressed general reservations about the death penalty in their written questionnaires. *Id.* at 318 ¶ 5. The court denied defense counsel's request to orally voir dire the jurors to rehabilitate them. *Id.* On review, we held that denying defense counsel the opportunity to rehabilitate the jurors was structural error. *Id.* at 324 ¶ 23. In contrast, Sanders was given ample opportunity to voir dire Juror 19 about his jury eligibility but chose not to do so.

¶**36**     Because there is no structural error, and Sanders did not object to the empanelment of Juror 19 at trial, we review Sanders' claim for fundamental error only. *See State v. Valverde*, 220 Ariz. 582, 585 ¶ 12 (2009).

¶**37**     Sanders' assertion that Juror 19 "lied to the trial court" is not supported by the record. Sanders' assumption that Juror 19's civil rights had not been restored because he applied to have his gun rights restored during trial is unwarranted. For first-time felony offenders, most civil rights, including the right to serve as a juror, are automatically restored upon: (1) discharge from probation or imprisonment, and (2) payment of any fines or restitution. A.R.S. § 13-912(A). However, restoration of the right to possess a weapon is not automatic; to restore this right, a person must file an application with the court. A.R.S. § 13-912(B).

¶**38**     We take judicial notice of Juror 19's superior court records regarding his criminal case. *See State v. Schackart*, 190 Ariz. 238, 247 (1997) (citing Morris K. Udall et al., *Arizona Practice, Law of Evidence* § 152, at 331 (3d ed. 1991) for the proposition that the "Supreme Court will take judicial notice of its own records and decisions and those of the superior courts"). The records show Juror 19 was discharged from probation in 2008 and that he paid his restitution in full. Thus, by operation of law, his civil right to serve on a jury was restored in 2008, well before Sanders' 2014 trial. *See* A.R.S. § 13-912(A). We find no error.

**Aggravating Factors**

¶39          Sanders challenges each of the aggravating factors found by the jury.

*Conviction for a Serious Offense (A.R.S. § 13-751(F)(2))*

¶40          Sanders argues that using his conviction for child abuse as both the predicate felony for felony murder and as an aggravating circumstance under A.R.S. § 13-751(F)(2) violates the Double Jeopardy Clause. *See* U.S. Const. amend. V; A.R.S. § 13-751(F)(2). We have previously rejected the argument that double jeopardy prohibits the use of predicate felonies as "capital sentencing aggravators." *State v. Goudeau*, 239 Ariz. 421, 470 ¶ 219 (2016) (citing *State v. Burns*, 237 Ariz. 1, 22 ¶ 86 (2015)); *State v. Cruz*, 218 Ariz. 149, 169 ¶ 130 (2008).

¶41          Sanders next argues that the (F)(2) aggravator violates the Eighth Amendment because it fails to genuinely narrow the field of death-eligible defendants. *See* U.S. Const. amend. VIII. Again, we have rejected similar challenges in recent cases, and we decline to revisit those decisions here. *See, e.g.*, *Goudeau*, 239 Ariz. at 470 ¶ 220 (stating that the (F)(2) aggravator does not violate the Eighth Amendment); *State v. Forde*, 233 Ariz. 543, 569 ¶¶ 105–07 (2014) (holding that the "(F)(2) aggravator does not violate the Eighth Amendment" because it "channels and limits the sentencer's discretion by explicitly identifying which offenses qualify as 'serious offenses'").

*Especially Cruel (A.R.S. § 13-751(F)(6))*

¶42          Sanders asks this Court to re-examine the issue of whether the "especially cruel" prong of the (F)(6) aggravator is unconstitutionally vague, both on its face and as applied. *See* § 13-751(F)(6). Because Sanders is not challenging the jury's finding that he committed Schala's murder in an especially heinous or depraved manner, his challenge to the (F)(6) finding fails. *See State v. Djerf*, 191 Ariz. 583, 595 ¶ 44 (1998) (noting that "a finding of either cruelty or heinousness/depravity will suffice to establish this factor"). Nonetheless, we address Sanders' challenge.

¶43          Here, the instructions given to the jury were not unconstitutionally vague. Sanders' argument was previously addressed by this Court in *State v. Anderson* (*Anderson II*), 210 Ariz. 327, 352–53 ¶¶ 109–14,

*supplemented*, 211 Ariz. 59 (2005). In *Anderson II*, we found that although the (F)(6) aggravator is vague on its face, the instructions given to the jury were not unconstitutionally vague because they "provided a sufficiently 'narrowed construction' . . . to the facially vague statutory terms." *Id*. at 353 ¶ 114. Since *Anderson II*, this Court has repeatedly approved "especially cruel" narrowing instructions requiring the jury to find the victim consciously suffered physical or mental pain and that the defendant knew or should have known that the victim would suffer. *See State v. Tucker*, 215 Ariz. 298, 310 ¶ 31 (2007) (listing *Anderson II* and subsequent decisions that approved such instructions). The instructions given in this case contained both narrowing factors.

*Murder of a Child Under Fifteen (A.R.S. § 13–751(F)(9))*

**¶44** Sanders argues that the (F)(9) aggravator "fails to adequately and rationally narrow those defendants subject to the death penalty" as required by the Eighth and Fourteenth Amendments because it applies to "[l]iterally 100 percent" of defendants over eighteen who murder someone under fifteen. We disagree.

**¶45** In *State v. Nelson*, we rejected the argument that the (F)(9) aggravator is overbroad, noting, "It is difficult to imagine an aggravating factor less susceptible than (F)(9) to a challenge on the grounds of vagueness or overbreadth." 229 Ariz. 180, 187 ¶ 27 (2012) (internal quotation marks omitted) (quoting *Jones v. Schriro*, 450 F. Supp. 2d 1047, 1078 (D. Ariz. 2006)). We have also recognized that the legislature had a compelling basis for creating the (F)(9) aggravator and setting the age at fifteen. *Id*. at 187 ¶ 28; *see also State v. Smith*, 193 Ariz. 452, 462 ¶ 48 (1999) ("[T]he legislature determined that the young and old are especially vulnerable and should be protected. It is not irrational for the legislature to conclude that murders of children and the elderly are more abhorrent than other first-degree murders.").

**Time Limits on Voir Dire**

**¶46** Sanders argues the court violated his constitutional right to an impartial jury by imposing a five-minute limit (per side) for individual voir dire. Sanders claims the time limit denied him sufficient time to conduct voir dire. Because Sanders agreed to the five-minute limit, we review for fundamental error. *State v. Gendron*, 168 Ariz. 153, 154 (1991).

**¶47**         A court is permitted to "impose reasonable limitations" on voir dire. Ariz. R. Crim. P. 18.5(d). We recently addressed such time limits in *Escalante-Orozco*. 241 Ariz. at 271 ¶¶ 33–34. There, we noted that the defendant must "demonstrate not only that the voir dire examination was inadequate, but also that, as a result of the inadequate questioning, the jury selected was not fair, unbiased, and impartial." *Id.* at 271 ¶ 33 (internal quotation marks omitted) (quoting *State v. Moody*, 208 Ariz. 424, 451 ¶ 95 (2004)).

**¶48**         Sanders has not shown that he was prejudiced by the time limits. There is no indication that he was denied an opportunity to voir dire a juror, and there is no evidence that a biased jury was ultimately impaneled. Indeed, the record shows that when either defense counsel or the prosecutor requested additional time to finish their voir dire, the court granted counsel's request each time.

## Failure to Strike Jurors 10, 31, and 72

**¶49**         Sanders argues that the trial court abused its discretion in denying his requests to strike Jurors 10, 31, and 72. Sanders claims these jurors were biased because they expressed opinions favoring the death penalty. Because none of the challenged jurors were seated on Sanders' trial jury, we review Sanders' use of his peremptory strikes to remove these jurors for harmless error. *State v. Hickman*, 205 Ariz. 192, 198 ¶ 28 (2003).

**¶50**         There was no error. Sanders used a peremptory strike on only one of the subject jurors (Juror 31) — one juror (Juror 10) was struck for cause, and another (Juror 72) was struck by the State. Additionally, Sanders has failed to show that the jury ultimately empaneled was not fair and impartial. *See State v. Garza*, 216 Ariz. 56, 65 ¶ 32 (2007).

## Autopsy Photographs

**¶51**         During the sentencing phase, the State introduced eight autopsy photographs of Schala. Sanders argues the trial court erred by

admitting these "gruesome" photographs of the victim.[2] Absent a clear abuse of discretion, we defer to the trial court's admission of graphic photographs. *State v. Doerr*, 193 Ariz. 56, 65 ¶ 41 (1998). "Whether the trial court abused its discretion in admitting a photograph turns on (1) the photograph's relevance, (2) its tendency to inflame the jury, and (3) its probative value compared to its potential to cause unfair prejudice." *State v. Cota*, 229 Ariz. 136, 147 ¶ 46 (2012).

**¶52** Sanders argues that the photographs had no probative value because the fact and cause of Schala's death were not at issue. As a result, he contends the "shock value" of the photographs "clearly outweigh[ed] any minimal probative value." *See State v. Chapple*, 135 Ariz. 281, 288 (1983), *superseded by statute on other grounds*, A.R.S. § 13-756 ("[I]f the photographs have no tendency to prove or disprove any question which is actually contested, they have little use or purpose except to inflame and would usually not be admissible.").

**¶53** Here, the photographs were relevant "to show the nature and location of the fatal injur[ies], to help determine the degree or atrociousness of the crime, to corroborate state witnesses, to illustrate or explain testimony, and to corroborate the state's theory of how and why the homicide was committed." *State v. Morris*, 215 Ariz. 324, 339 ¶ 70 (2007) (quoting *Chapple,* 135 Ariz. at 288); *see also Anderson II*, 210 Ariz. at 340 ¶ 40 (stating the autopsy photographs were relevant to show the "fact and cause of death"). Dr. Horn, the medical examiner, used all the photographs (except Exhibit 53) to explain his testimony concerning the injuries he saw while performing Schala's autopsy. Dr. Horn's testimony regarding the cause of Schala's death —"multiple blunt force injuries"—was based, in part, on these photographs. The State also used Exhibit 53 during Nurse Jack's testimony. This photograph supported her testimony that she saw bruises on "[a]lmost every single part of [Schala's] body."

**¶54** The photographs were also relevant to rebut Sanders' claim that because he only spanked Schala with a belt, it was unforeseeable that his actions would cause her death. *See supra* ¶¶ 8–10*; see also State v. Villalobos*, 225 Ariz. 74, 80 ¶ 22 (2010) (finding autopsy photographs

---

[2] The State sought to introduce a total of eleven photographs. However, three of these photographs, exhibits 40, 51, and 80, were never admitted into evidence.

depicting various internal injuries were relevant to rebut defendant's argument that victim seemed fine after the beating and his suggestion that she died because of lack of prompt medical attention). The probative value of the photographs was not substantially outweighed by the danger of unfair prejudice. *See* Ariz. R. Evid. 403. While graphic and disturbing, the photographs were not so unduly gruesome as to be inadmissible. *Cf. Villalobos*, 225 Ariz. at 80 ¶ 23 (finding autopsy photographs depicting internal injuries of child beaten to death admissible). Nor were the photographs cumulative.

¶55 Dr. Horn and Nurse Jack used each of the photographs to explain different parts of their testimony. *Cf. Escalante-Orozco*, 241 Ariz. at 279 ¶ 85 ("The autopsy photographs were not cumulative because the medical examiner used each one to explain a different aspect of his testimony.").

**Apology Letters**

¶56 Sanders argues the trial court violated his right to a fair trial by precluding two "apology letters" he wrote during his police interview.

¶57 The court did, in fact, admit the letters. The court initially ruled they were inadmissible as hearsay. However, during the guilt phase and before the State rested its case-in-chief, the court reversed its ruling. The court determined the letters were admissible because the State had elicited testimony tending to show that Sanders was cold and emotionless during his police interview. The court concluded that the apology letters were admissible to complete the story and avoid potentially misleading the jury about Sanders' demeanor during his interview.

¶58 Sanders also complains that because the court did not admit the letters until the last day of the State's case-in-chief, its ruling came too late. Specifically, Sanders claims he was denied the opportunity to use the letters during his opening statement and cross-examination of the State's witnesses. We review a trial court's ruling on the admissibility of evidence for an abuse of discretion. *State v. Boggs*, 218 Ariz. 325, 334 ¶ 38 (2008).

¶59 There is no error. The trial court correctly ruled initially that the apology letters were hearsay. *See* Ariz. R. Evid. 106, 801–04. In addition, the apology letters had minimal probative value as to Sanders' guilt and were not relevant to show Sanders' mental state during the commission of

the crime. *Cf. State v. Prince*, 226 Ariz. 516, 543 ¶ 121 (2011) (stating a defendant's expression of remorse is a non-statutory mitigating factor); *State v. Sansing*, 206 Ariz. 232, 241 ¶ 35 (2003) (same).

¶60 Sanders suffered no prejudice from the subsequent admission of the letters. Nothing prevented Sanders from recalling the State's witnesses and confronting them with the apology letters. Indeed, Sanders confronted Detective Kaminsky with the letters during his cross-examination, and he used the apology letters during his closing argument in the guilt phase. Finally, Sanders used the apology letters as mitigation evidence (remorse) during the penalty phase.

### Testimony Regarding "Worst Case of Child Abuse"

¶61 Sanders claims that the trial court violated his due process right to a fair trial by denying his motion for a mistrial after multiple State witnesses testified that this was "the worst case of child abuse" they had ever seen. Denial of a mistrial motion is reviewed for an abuse of discretion. *State v. Miller*, 234 Ariz. 31, 40 ¶ 23 (2013).

¶62 During the guilt phase, the prosecutor asked several witnesses, "Do you have an independent recollection of this case?" In response to this question, one officer testified that he could "recall the scene" "very vividly" because he "had small children at the same time that were very close in age, and it was something that — it affected me." Another witness, an emergency room physician, responded that he remembered this case because "it's a very uncommon case. The age of the patient, uh, is something that unquestionably will stick with you." Nurse Jack responded to the prosecutor's question by stating that she had "seen a lot of horrible things" as a trauma nurse, but she had "never seen anything like this." She also testified that she kept "a picture of Schala" at her house "because it was something I will never forget." Finally, Dr. Horn responded by stating that "[t]his is one of the — one of the worst child homicide cases I've ever dealt with in terms of the number, extent of injuries. That was impressive, even for the people in my office, and myself."

¶63 Following Dr. Horn's testimony, Sanders moved for a mistrial. The court denied the motion and ruled that the State could continue asking its witnesses if they had an independent recollection of the

case. However, the court ordered the State to instruct its future witnesses not to use the words "worst case" in explaining why they had an independent recollection. Additionally, at Sanders' request, the court gave the following curative instruction to the jury:

> You have heard some witnesses refer to this case as the worst case of child abuse they have seen. This evidence is admitted only for the limited purpose of assessing each witness'[s] credibility and ability to recall the events. You must consider it only for that limited purpose and not for any other purpose. It is your duty to decide the facts based on the evidence produced in court, and you must not be influenced by sympathy or prejudice.

**¶64** We reject Sanders' argument. The prosecutor's question about the witnesses' independent recollections was relevant to establishing their credibility and ability to accurately recall the events. Additionally, any prejudice Sanders may have suffered from the witnesses' "worst case" comments was remedied by the court's curative instruction. *See Villalobos*, 225 Ariz. at 80 ¶ 20.

**Jury Instructions**

**¶65** Sanders argues that the "voluntary act" instruction given to the jury was improper. We disagree. As a preliminary matter, Sanders requested this instruction. He therefore invited any error. *See State v. Logan*, 200 Ariz. 564, 565 ¶ 8 (2001). Additionally, we have previously held that a similar voluntary act instruction was proper. *State v. Lara*, 183 Ariz. 233, 234–35 (1995).

**¶66** Next, Sanders claims the trial court's instruction on felony murder improperly relieved the State of its burden to prove criminal intent. Again, we disagree. Felony murder "requires no specific mental state other than what is required for the commission of any of the enumerated [predicate] felonies." A.R.S. § 13-1105(B). Here, the predicate felony, child abuse, required the State to prove that Sanders intentionally or knowingly caused Schala to suffer physical injury. A.R.S. § 13-3623(A)(1) (child abuse); *State v. Payne*, 233 Ariz. 484, 506 ¶ 71 (2013). Thus, the trial court properly instructed the jury that the only intent the State had to prove for felony murder was that Sanders intentionally or knowingly hit Schala with a belt

19

and that action resulted in Schala's death. *See* A.R.S. § 13-3623(A)(1); *Payne*, 233 Ariz. at 506 ¶ 71; *see also* A.R.S. § 13-1105(A).

## Sufficiency of the Evidence — Count III (Child Abuse)

¶67 Sanders argues that the trial court erred by denying his motion for judgment of acquittal on Count III, Child Abuse, after the close of the State's evidence. We review the trial court's ruling de novo. *Goudeau*, 239 Ariz. at 461 ¶ 168.

¶68 Count III was based on the injuries Sanders inflicted on Schala before her fatal beating — specifically, the injuries she suffered between June 1, 2009, and August 29, 2009. To convict Sanders of this charge, the State had to prove that (1) "[u]nder circumstances other than those likely to produce death or serious physical injury," (2) Sanders "intentionally or knowingly" (3) caused Schala to suffer a physical injury. A.R.S. § 13-3623(B)(1).

¶69 Substantial evidence supports Sanders' conviction. Dr. Horn testified that several of Schala's wounds consisted of a "fresh injury possibly over an older injury," and that it was possible older bruises on Schala's extremities were covered by more recent bruises. *See supra* ¶ 11. In addition, Sanders admitted to police that during the period from late May or early June 2009 until Schala's death, he had routinely beat her with a belt "once or twice a week." *See supra* ¶¶ 5–7.

## Duplicitous Charge

¶70 Sanders also claims that Count III was duplicitous because it alleged, in one count, multiple acts of child abuse occurring over a period of three months. Sanders argues he was denied adequate notice as to which specific act during this time was the basis for the charge. He also claims the charge was duplicitous because it created the risk of a non-unanimous jury verdict. Although Sanders did not raise this issue until his reply brief, we address it because both Sanders and the State addressed the issue during Sanders' Rule 20 motion in the trial court. The State also addressed the issue in its answering brief.

¶71 The indictment clearly informed Sanders that Count III was based on his ongoing course of conduct. The evidence showed that Sanders

beat Schala from the time she returned to Arizona in late May or early June until the day of her death on August 31, 2009. *See supra* ¶¶ 4–11. We have held that "where numerous transactions are merely parts of a larger scheme, a single count encompassing the entire scheme is proper." *State v. Via*, 146 Ariz. 108, 116 (1985); *see also State v. Klokic*, 219 Ariz. 241, 245 ¶ 18 (App. 2008) ("[M]ultiple acts may be considered part of the same criminal transaction when the defendant offers essentially the same defense to each of the acts and there is no reasonable basis for the jury to distinguish between them." (internal quotation marks omitted)).

¶72 In addition, although Sanders hit Schala with a belt on numerous occasions during this time period, there was no reasonable basis for the jury to distinguish between these beatings preceding her fatal beating. Indeed, Sanders has not articulated how his defense would have changed had the State focused on one incident. *See State v. Ramsey*, 211 Ariz. 529, 533 ¶ 7 (App. 2005) ("Although, under some circumstances, an indictment's lack of specificity might hamper a defendant's ability to rebut or defend against the charges, Ramsey has not shown how his defense was impaired or prejudiced by the indictment against him."); *see also State v. Whitney*, 159 Ariz. 476, 480 (1989) (finding no prejudice because defendant's only defense was that the offenses did not occur and the victims fabricated their stories). Sanders' defense was the same as to all the beatings — he was just "spanking" Schala and was not aware he was endangering her life.

### Mitigation Standard

¶73 Sanders argues the prosecutor violated his due process rights by misstating the law on mitigation during her penalty phase closing argument. Because Sanders did not object, we review for fundamental error only. *State v. Martinez*, 218 Ariz. 421, 426 ¶ 15 (2008).

¶74 Sanders contends that the prosecutor erroneously told the jurors that in determining whether mitigation evidence was sufficiently substantial to call for leniency, they must consider the mitigation evidence "in its totality." Sanders claims this misstated the law because a single proven mitigating factor "can carry the day"; as a result, there is no statutory requirement for the jury to consider mitigation in its totality. *See* A.R.S. § 13-751(E).

¶75        The prosecutor's argument was based on the court's instruction. The court instructed the jurors that in determining whether mitigation warrants leniency, "you must decide how compelling or persuasive the totality of the mitigating factors is when compared against the totality of the aggravating factors . . . ." Rev. Ariz. Jury Instr. ("RAJI") Stand. Crim. 3, Cap. Case 2.6. This is a correct statement of the law. *State v. Gunches* (*Gunches II*), 240 Ariz. 198, 206 ¶ 37 (2016); *State v. Carlson*, 237 Ariz. 381, 396 ¶¶ 51, 54 (2015). Based on the instruction, the prosecutor properly argued that the jurors were to consider mitigation "in its totality," thereby urging them to consider *all* mitigating factors and *all* aggravating factors in making their decision. *See Carlson,* 237 Ariz. at 396 ¶ 54 & n.6.

¶76        Next, Sanders argues the prosecutor improperly told the jury that forgiveness is "not your job." Sanders claims that "forgiveness" is synonymous with leniency and is therefore properly considered by the jury.

¶77        A capital defendant is free to argue that mercy or leniency is appropriate based on the mitigation evidence. *State v. Andriano*, 215 Ariz. 497, 507 ¶ 48 (2007), *abrogated on other grounds by State v. Ferrero*, 229 Ariz. 239 (2012). However, any such argument invites a rebuttal by the State. *See State v. Trostle*, 191 Ariz. 4, 16 (1997) ("Comments that are invited and prompted by opposing counsel's arguments are not improper if they are reasonable and pertinent to the issues raised.").

¶78        Sanders takes the prosecutor's comments out of context. She never argued the jury could not consider leniency. Rather, the prosecutor simply argued that leniency "is not a question of forgiveness." She stated that the law and the instructions *required* them "to determine whether or not there are mitigating factors that are sufficiently substantial to call for leniency." *See* A.R.S. § 13-751(E).

¶79        Sanders contends that the prosecutor also erred when she told the jurors, "If you find that there are no mitigating factors, you shall impose death. That is what the law requires." Sanders asserts the prosecutor's statement was erroneous because "the law never requires a death sentence."

¶80        The prosecutor did not misstate the law. Pursuant to A.R.S. § 13-751(E), "[t]he trier of fact *shall impose a sentence of death* if [it] finds one or more of the aggravating circumstances . . . and then determines that there

are no mitigating circumstances sufficiently substantial to call for leniency." (emphasis added); *see also Tucker*, 215 Ariz. at 317–18 ¶ 74 (stating that A.R.S. § 13-751(E) "allows a juror to vote to impose death only if he or she concludes that there is no mitigation sufficiently substantial to warrant leniency," which "does not imply . . . that a juror may vote for leniency even if he or she finds there is no mitigation"). Thus, "a juror must vote to impose a sentence of death if he or she determines there is no mitigation at all." *Id.*

¶81 Sanders claims the State also "misstated the law regarding hearsay in mitigation presentations" when the prosecutor stated regarding hearsay, "We have to accept what that person reports another person said. You should take that into consideration when determining whether or not to accept or reject that testimony."

¶82 The prosecutor did not argue that hearsay was inadmissible. *See* A.R.S. § 13-751(C) (stating that mitigation evidence is admissible during a capital sentencing phase "regardless of its admissibility under the rules governing admission of evidence at criminal trials"). Rather, the prosecutor properly argued that it was up to the jury to determine whether hearsay testimony is credible. *See Boggs*, 218 Ariz. at 335 ¶ 39 ("Determining veracity and credibility lies within the province of the jury . . . .").

*Nexus*

¶83 Sanders argues that it was improper for the prosecutor to argue that "Dr. Seward said there was no [PTSD] trigger identified. He found that there was no nexus to the murder." Sanders claims this argument improperly suggested that he was required to prove a causal nexus between his proffered mitigation (PTSD) and the murder. *See State v. Newell*, 212 Ariz. 389, 405 ¶ 82 (2006) ("We do not require that a nexus between the mitigating factors and the crime be established before we consider the mitigation evidence." (citing *Tennard v. Dretke*, 542 U.S. 274, 287 (2004))).

¶84 Sanders mischaracterizes the prosecutor's statement. The State never suggested that, absent a nexus between Sanders' PTSD and Schala's murder, the jury could not consider his PTSD as mitigation. Instead, the prosecutor specifically stated that in determining how much "value to assess" mitigation, "it is important to remember that this evidence

doesn't have to be connected specifically to the murder. But you may consider whether or not it is connected to the murder in determining how much weight to give that evidence."

¶85        The prosecutor's argument regarding Dr. Seward's testimony properly addressed the weight the jury should ascribe to his testimony. *See Villalobos*, 225 Ariz. at 83 ¶¶ 38–39 ("[T]he state may fairly argue that the lack of a nexus to the crime diminishes the weight to be given alleged mitigation," and "[t]he jury may thus appropriately consider a lack of causal nexus when 'assessing the quality and strength of mitigation.'" (quoting *Newell*, 212 Ariz. at 405 ¶ 82)); *Anderson II*, 210 Ariz. at 350 ¶ 97 ("Once the jury has heard all of the defendant's mitigation evidence, there is no constitutional prohibition against the State arguing that the evidence is not particularly relevant or that it is entitled to little weight.").

¶86        Furthermore, any potential error was remedied by the jury instructions, which informed the jurors: "You are not required to find that there is a connection between a mitigating circumstance and the crime committed in order to consider the mitigation evidence. Any connection or lack of connection may impact the quality and strength of the mitigation evidence." *See State v. Pandeli*, 215 Ariz. 514, 526 ¶ 33 (2007) (finding any potential error cured when the jury instructions informed the jurors that they should consider and give effect to all the mitigation evidence).

*Mitigation as an Excuse or Justification*

¶87        Sanders claims the prosecutor misstated the law by stating that mitigation is not an excuse or justification for Schala's murder.

¶88        There was no error. The prosecutor restated the applicable jury instruction, which was an accurate statement of the law. *See* RAJI Stand. Crim. 3, Cap. Case 2.3; *Prince*, 226 Ariz. at 538 ¶ 89. Indeed, it would have been improper for the prosecutor to suggest otherwise, because equating Sanders' mitigation with an "excuse" or "justification" for Schala's murder may have improperly implied that Sanders was required to establish a nexus between the murder and his mitigation evidence. *See, e.g., Prince*, 226 Ariz. at 538 ¶¶ 88–89.

**Admission of Susan's Statements**

¶89        Sanders argues the trial court violated his right to a fair trial and his Sixth Amendment right to confront witnesses by admitting Susan's interview with police at the hospital, her statements to the police during her car ride to the police station, and the video and audio of her interrogation at the police station. *See Crawford v. Washington*, 541 U.S. 36, 50–52 (2004). We review alleged constitutional violations de novo. *Boggs*, 218 Ariz. at 333 ¶ 25.

¶90        We reject Sanders' claim. This evidence was admitted as rebuttal evidence during the penalty phase, and thus was not subject to the Confrontation Clause. *See State v. Guarino*, 238 Ariz. 437, 442–43 ¶ 24 (2015).

**Cumulative Prosecutorial Misconduct**

¶91        Sanders alleges that several instances of prosecutorial misconduct occurred throughout the trial. He claims the cumulative effect of this misconduct requires this Court to set aside the verdict. Because Sanders did not preserve this objection at trial, we review for fundamental error only. *State v. Rutledge*, 205 Ariz. 7, 13 ¶ 30 (2003).

¶92        "To prevail on a claim of prosecutorial misconduct, a defendant must demonstrate that the prosecutor's misconduct 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *State v. Hughes*, 193 Ariz. 72, 79 ¶ 26 (1998) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

*Showing post-mortem photographs*

¶93        As discussed *supra* ¶¶ 53–56, the trial court did not err in admitting a limited number of autopsy photographs of Schala; therefore, the prosecutor did not commit misconduct by showing these photographs to the jury. *See Burns*, 237 Ariz. at 31 ¶ 149.

*Apology Letters*

¶94        Similarly, as discussed *supra* ¶ 60, the trial court did not err in ruling initially that the apology letters were inadmissible during the guilt

phase. As a result, the prosecutor did not commit misconduct by seeking to preclude these letters.

*Characterizing Sanders as Stoic and Unemotional*

**¶95** It was not improper for the prosecutor to elicit testimony that Sanders was stoic and unemotional during his police interview. A prosecutor may properly question witnesses about their observations of the defendant's demeanor during relevant events in a case. *See State v. Mauro*, 159 Ariz. 186, 198 (1988) ("The subject of the prosecutor's inquiry was defendant's demeanor . . . . Such an inquiry is a permissible one.").

*Eliciting "worst case" testimony*

**¶96** Sanders argues that "the prosecutor committed pervasive misconduct" by intentionally eliciting a "large number" of "worst case" remarks from witnesses. As discussed *supra* ¶ 64, it was not improper for the prosecutor to question the witnesses about their independent recollection of the case. In addition, the court provided a curative instruction to remedy any prejudice.

*"Misstating" mitigation standard*

**¶97** Sanders alleges that during closing argument the prosecutor made numerous misstatements regarding the law on mitigation. Because the prosecutor did not misstate the law, there was no misconduct. *See supra* ¶¶ 73–80.

*Disparaging defense counsel*

**¶98** During the guilt phase closing argument, the prosecutor remarked, "It's offensive that the defense stands before you and tells you that what [Sanders] did to Schala is discipline." Sanders did not object to the statement. In referring to this remark, the court warned the prosecutor (outside the presence of the jury) to "stay away from the disparaging [of defense counsel] in any way." The prosecutor made no further comments about defense counsel.

**¶99** It is improper for a prosecutor to impugn the integrity of defense counsel. *Hughes*, 193 Ariz. at 86 ¶ 59. However, there is no

reasonable likelihood that this isolated statement affected the jury's verdict. Furthermore, any prejudice was cured by the court instructing the jury that what the lawyers say in closing arguments is not evidence. *See Prince*, 226 Ariz. at 538 ¶ 90.

*Raising the Rape Allegation*

**¶100** Sanders argues that the prosecutor's "unfounded allegation that [Sanders] had committed a rape while he was in the military" amounted to prosecutorial misconduct. *See supra* ¶ 24. Sanders asserts the State had no "good faith" evidentiary basis to ask this question. Additionally, Sanders claims this evidence was not admissible under Arizona Rules of Evidence 404(b) and 403, and that its admission violated his rights under the Sixth and Fourteenth Amendments.

**¶101** We note that Rule 404(b) does not apply during the penalty phase of a capital case. *See* A.R.S. § 13-751(C); *see also State v. Chappell*, 225 Ariz. 229, 239 ¶ 37 (2010); *Martinez*, 218 Ariz. at 431 ¶ 44 n.11. In addition, the record shows that Sanders had been investigated for rape in the military, and therefore the prosecutor did not misrepresent this fact or mislead the jury. *Cf. Miller v. Pate*, 386 U.S. 1, 6 (1967); *Hughes*, 193 Ariz. at 86 ¶ 61. Sanders disclosed the investigation to Detective Kaminsky, and a mitigation witness also disclosed the investigation to the State. In addition, Detective Kaminsky contacted a Naval Criminal Investigative Service special agent to confirm that Sanders was in fact investigated for rape.

*Arguing with mitigation witness*

**¶102** Sanders also claims that the State committed prosecutorial misconduct by "open[ly] arguing" with a mitigation witness during cross-examination. The record shows that the witness was irritated by what he perceived to be the prosecutor's disrespect for his military service. Thus, the witness refused to answer the prosecutor's questions about his military service. Based on our review of the record, we conclude the prosecutor did not engage in any misconduct with this witness.

*Cumulative Misconduct*

**¶103** Sanders has failed to show that any misconduct "permeate[d] the entire atmosphere of the trial." *Hughes*, 193 Ariz. at 79 ¶ 26 (quoting

*State v. Atwood*, 171 Ariz. 576, 611 (1992)).  Furthermore, he has not shown that the claimed misconduct amounted to fundamental, prejudicial error. Accordingly, we reject his claim of cumulative prosecutorial misconduct.

## Other Constitutional Claims

**¶104**     Sanders lists twenty-six additional constitutional claims to preserve them for federal review.  Sanders acknowledges that we have previously rejected all these claims.  We decline to revisit them.

## Death Sentence

**¶105**     Sanders contends that we should reduce his death sentence to life because his mitigation was substantial and not rebutted by the State. "We must uphold a jury's determination that death is the appropriate sentence if any 'reasonable juror could conclude that the mitigation presented was not sufficiently substantial to call for leniency.'"  *State v. Naranjo*, 234 Ariz. 233, 250 ¶ 89 (2014) (quoting *State v. Gallardo*, 225 Ariz. 560, 570 ¶ 52 (2010)).

**¶106**     Sanders has the burden of proving the existence of mitigating circumstances by a preponderance of the evidence.  A.R.S. § 13-751(C); *Tucker*, 215 Ariz. at 321–22 ¶ 106.  But the jurors do not have to agree that a certain mitigating circumstance has been proven; rather, each juror may consider any mitigating circumstance in determining the appropriate sentence. *See* A.R.S. § 13-751(C).

**¶107**     Here, Sanders proffered the following statutory mitigating circumstances: (1) he suffered from PTSD, which impacted his ability to appreciate the wrongfulness of his conduct, *see* A.R.S. § 13-751(G)(1); (2) he could not have reasonably foreseen that his actions would cause or create a grave risk of death because what he perceived as similar abuse/discipline that he suffered as a child did not cause his death, *see* A.R.S. § 13-751(G)(4); and (3) his age and emotional immaturity, A.R.S. § 13-751(G)(5).  He also proffered the following non-statutory mitigating factors: (4) he had no positive male role model to teach him how to be a proper caregiver; (5) physical and emotional abuse by his mother; (6) his mother is "emotionally bankrupt" and never wanted children; (7) he was a good student and had appropriate relationships with peers; (8) he served his country as a Marine and saw combat despite only being trained as a cook;

(9) he had no money or direction in life after the Marines, and Susan was a negative influence; (10) he used the same punishment on Schala that was inflicted on him as a child; and (11) remorsefulness and cooperation with police.

¶108　　　　The State challenged the alleged mitigation with rebuttal testimony or argument, and also argued that the mitigating factors, if proven, should be given little weight.　Even if we assume Sanders proved each mitigating circumstance, a reasonable juror could conclude they were not sufficiently substantial to call for leniency, and thus the jury did not abuse its discretion.

### III.

¶109　　　　We affirm Sanders' convictions and sentences.